Lowell **PERKINS**, et ux., Appellants,

v.

**DEAN MACHINERY COMPANY,**
Respondent.

No. WD 62576.

Missouri Court of Appeals,
Western District.

April 30, 2004.

Leonard B. Rose, John David Seaton, Kansas City, MO, for appellant.

Linda S. Tarpley, Overland Park, KS, for respondent.

Before VICTOR C. HOWARD, P.J., HAROLD L. LOWENSTEIN, and JAMES M. SMART, JR., JJ.

JAMES M. SMART, JR., Judge.

Lowell and Rena Perkins appeal the trial court's grant of a directed verdict in favor of Dean Machinery on the issue of punitive damages associated with the Perkins' claims for conversion and trespass on which they prevailed before a jury. We reverse and remand for a trial on the issue of punitive damages.

## Statement of Facts

■ In reviewing a directed verdict in favor of the defendant, we view the evidence and all reasonable inferences therefrom in the light most favorable to the plaintiff's case. *McNear v. Rhoades*, 992 S.W.2d 877, 884 (Mo.App.1999). Lowell and Rena Perkins, residents of Daviess County, operated an earth moving business. In 1993, the Perkins purchased a used D6D Caterpillar bulldozer. The Perkins had recurring problems with the bulldozer's "final drives," and the Dean Machinery branch store in Chillicothe repaired it on five different occasions in less than two years. The first four repairs were performed in the field, but in October of 1996, the bulldozer had to be brought into the shop for repair. At the time of that repair, the Perkins still owed approximately $7,500.00 on the previous repair.

While the bulldozer was being repaired, the parties entered into an agreement, dated December 3, 1996, whereby the cost of the latest repair would be apportioned between Dean and the Perkins, and the amount of those repairs would be added to the already past-due amount and put on a note payable to Dean. The Perkins signed the agreement showing how the repairs would be apportioned. That agreement did not include any dollar amounts for the new repairs. Mrs. Perkins received a written accounting from David Sage, Dean's manager of the Chillicothe store, showing that the Perkins' share of the estimated new repairs would be $9,614.56.

It is unclear exactly when the repairs were completed, but at some point in December 1996, the Perkins picked up the bulldozer from Dean and put it back into service. Rena Perkins testified that it was only later, when she returned to Dean to pick up some parts, that Mr. Sage presented her with a financing statement, a security agreement, and a promissory note, which showed that the Perkins owed $24,867.51. The documents were dated December 19, 1996. Mrs. Perkins stated that she obtained a copy of the bill and left with the documents to go discuss the higher-than-expected charges with her husband. Those documents were, of course, designed to give Dean a security interest for the indebtedness and the right to repossess the bulldozer in the event of default. Rena Perkins testified she never brought the documents back to Dean.

In January 1997, Dean recorded documents perfecting its apparent security interest in the bulldozer. The documents purported to bear Lowell Perkins' signature. The Perkins were unaware of the recording. On March 7, 1997, the Perkins received in the mail what purported to be revised versions of the promissory note and security agreement from Dean. A cover letter requested that they sign these documents. The letter also asked for payment in the amount of $4,578.46 for past-due payments through February. Dean's credit manager, Robert Vermillion, testified that when he reviewed the original documents almost three months after they

were drawn up, he noted that the promissory note did not include the combined amounts of principle and interest. He stated that the originals were accurate, and that the amounts due could be stated either way, but he felt that "corrected" copies should be executed in order to make the terms "clearer." The Perkins did not sign the revised documents.

The Perkins failed to make the monthly payments on the bulldozer repairs. Dean sent default notices to the Perkins in September, October, and November of 1997. The Perkins did not respond to those notices. In December of 1997, a year after the final repair, Dean went onto the Perkins' property and repossessed the bulldozer for alleged default under the terms of the promissory note and security agreement which Dean had earlier recorded.

The Perkins subsequently filed suit against Dean, seeking actual and punitive damages. Dean counterclaimed for amounts due for goods and services provided. The case was tried before a jury.

Lowell Perkins testified at trial that he never signed the documents. The three documents presented at trial bore what appeared to be the signature of Lowell Perkins. The documents were designed for signature only by Lowell Perkins, although Rena Perkins was a co-owner with her husband of the bulldozer. Rena Perkins denied signing any of the documents.

The Perkins presented a handwriting expert, William Storer, at trial.[1] The expert determined that the signatures on the documents "definitely" were not written by Lowell Perkins and concluded that the signatures were forgeries. Defendant Dean

was precluded from presenting its own expert, although it had intended to do so, because it failed to supplement discovery before trial by identifying the expert. Defendant Dean also waived all cross-examination of the plaintiffs' expert. Therefore, the testimony of plaintiffs' expert remained unimpeached, uncontradicted and unchallenged.

David Sage, the Dean store manager, acknowledged at trial that he had not witnessed Mr. Perkins sign the documents. Sage testified that Rena Perkins took the documents, returned them after signature by Lowell Perkins, and then picked up the bulldozer. Sage testified that he released the bulldozer only after he had the signed documents in his possession. Sage stated, "I would have gotten [the signed security agreement] back before I released the dozer."

Sage's testimony was impeached, however, by prior inconsistent statements. In his 1999 deposition, taken three years earlier, he testified that he watched Lowell Perkins sign the three documents in his office and that Perkins willingly signed. Sage also stated in his deposition, contrary to his trial testimony, that he released the repaired bulldozer to the Perkins *before* obtaining their signatures on a note or security agreement. Sage offered no explanation for the dramatic turnaround in his testimony.

At the close of all the evidence, Dean moved for directed verdict on all the claims against them. The trial court granted Dean a directed verdict on the tortious interference claim and on the claim for punitive damages.

1. The expert had been a document examiner for forty-two years; held Bachelor's and Master's of Science degrees; apprenticed with the St. Louis Police Laboratory; was board certified by the American Board of Forensic Document Examiners; had taught at the college level and recently published a college textbook; and has his own private practice, with clients that include the police departments and prosecutors' offices in St. Louis and Jackson County.

The jury returned a verdict in favor of the Perkins on their claims for conversion and trespass for $25,000.00 and $5,000.00 respectively. The jury also found for Dean on its counterclaim for moneys due in the amount of $17,100.07.

The Perkins appeal the directed verdict on their claim for punitive damages.

## Standard of Review

■ Whether there is sufficient evidence for an award of punitive damages is a question of law. *See Rodriguez v. Suzuki Motor Corp.,* 936 S.W.2d 104, 109–11 (Mo. banc 1996); *see also* 22 AM.JUR.2D, *Damages,* § 550 (2003); *DeLong v. Hilltop Lincoln–Mercury, Inc.,* 812 S.W.2d 834, 841 (Mo.App.1991). We review the evidence presented to determine whether, as a matter of law, it was sufficient to submit the claim for punitive damages. In doing so, we view the evidence and all reasonable inferences in the light most favorable to submissibility. *M.C. v. Yeargin,* 11 S.W.3d 604, 614 (Mo.App.1999). A submissible case is made if the evidence and the inferences drawn therefrom are "sufficient to permit a reasonable juror to conclude that the plaintiff established with convincing clarity—that is, that it was highly probable—that the defendant's conduct was outrageous because of evil motive or reckless indifference." *Fabricor, Inc. v. E.I. DuPont de Nemours & Co.,* 24 S.W.3d 82, 96–97 (Mo.App.2000).

## Submissible Claim for Punitive Damages

■ The Perkins contend that the trial court erred in granting a directed verdict on punitive damages because they presented sufficient evidence that Dean's act of conversion (the repossession of the bulldozer based on a document forged by someone at Dean) was outrageous due to its evil motive or reckless indifference to the Perkins' rights. Thus, a reasonable juror, the Perkins claim, could have found by clear and convincing evidence that punitive damages were warranted.

■ Punitive damages are appropriate when a jury finds that the defendant intentionally converted property and that the converter's conduct was outrageous because of his evil motive or reckless indifference to the rights of others. *Walker v. Hanke,* 992 S.W.2d 925, 937 (Mo.App. 1999); *see also* RESTATEMENT OF THE LAW 2D, *Torts,* § 908(2) (1979). Punitive damages are imposed to punish and deter. *Rodriguez,* 936 S.W.2d at 110. It is a remedy so extraordinary or harsh, however, that it should be applied only sparingly and requires that the evidence meet the clear and convincing standard of proof. *Id.* at 111. Evaluating the sufficiency of the evidence to submit punitive damages is largely dependent upon the facts of each particular case. *Hoskins v. Business Men's Assurance,* 116 S.W.3d 557, 570 (Mo.App.2003); 25 C.J.S., *Damages,* § 202 (2002).

The Perkins allege that they presented sufficient evidence to submit the punitive damages claim to the jury because they demonstrated that someone at Dean forged Lowell Perkins' signature on the documents. The Perkins point out that Dean had both the opportunity (because Perkins' signature was on file with Dean) and motive to forge Lowell Perkins' signature on the documents. They also contend they demonstrated that Lowell Perkins did not sign the documents, and there was no evidence that anyone other than someone at Dean forged the signatures. They also add that the jury's verdict in favor of the Perkins on their conversion and trespass claims shows that the jury believed someone at Dean forged the documents.

Dean claims that since the Perkins were unable to point to any particular person at

Dean who forged the signatures, the Perkins have failed in their efforts to show that Dean acted with evil intent or reckless indifference so as to warrant submission of the punitive damages claim.

We view the evidence and inferences in the light most favorable to submissibility, keeping in mind that we are looking for evidence that establishes with convincing clarity that the defendant's conduct was outrageous because of evil motive or reckless indifference.

 For intentional tort cases, "[p]unitive damages require a showing of a culpable mental state on the part of the defendant, either by a wanton, willful or outrageous act or reckless disregard (from which evil motive is inferred) for an act's consequences." *Fabricor*, 24 S.W.3d at 96–97. Factual inferences which convincingly and clearly support the notion that the defendant acted with evil motive or reckless indifference to the rights of others are sufficient to meet the standard for submission of punitive damages.

The purpose of punitive damages is to punish and deter. *See Rodriguez*, 936 S.W.2d at 110. Society has an obvious policy interest in deterring and punishing forgery of financial documents in such circumstances.

The evidence strongly indicated that the signatures on the documents were not the genuine signatures of Lowell Perkins. The Perkins' handwriting expert testified that the signatures on the documents "definitely" were not written by Lowell Perkins, and that the signatures had to be forgeries. The expert's testimony went unchallenged. The Perkins also both testified that they did not sign the documents. Dean had both opportunity (because it had Lowell Perkins' signature on file) and obvious motive to forge the signature.

The conduct of Dean in seeking a signature on another copy of similar documents later could be viewed as corroborative. Dean sent the Perkins "corrected" copies of the documents months later, after the original recording of documents, asking for the Perkins' signature again. The original documents were entirely adequate and were prepared in keeping with the usual practice of reciting the principal amount of the loan and the applicable rate of interest. The "corrections" were unnecessary. This, the Perkins argue, was evidence that Dean knew that the original signatures were forged. Dean was hoping, the Perkins say, to obtain authentic signatures on the new documents in order to moot the significance of the fact that the signatures on the original documents were forgeries.

The trial court, in denying submission of the punitive claim, expressed its concern that the expert's testimony never went beyond stating that Lowell Perkins did not sign the documents. It is true that there was no *expert* testimony ruling out the possibility that Mrs. Perkins had signed the documents on behalf of her husband, although she denied signing them and there was no particular reason offered by Dean to believe that she did sign them. Also, there was no testimony that any particular person at Dean had perpetrated the forgery. These factors apparently influenced the trial court.

Without the dramatic contradictions in David Sage's testimony at trial, and without the attempt by Dean to get the Perkins to sign the "corrected" copies of the finance documents, the posture of this case might not be the same. No explanation is provided by Dean for why, after Sage said in his 1999 deposition testimony that he remembers Lowell Perkins signing the documents in his presence, Sage would then totally change his testimony at trial in 2003. The Perkins do offer a reason: "Mr. Sage no doubt changed his testimony because he learned that his deposition tes-

timony (in which he claimed that he witnessed Lowell Perkins signing the documents) was indefensible under any type of handwriting analysis." We agree that it seems patent that he changed his story in view of the anticipated strength of the handwriting evidence.

Further, the unnecessary sending of the so-called "corrected" copies of the paperwork, when the original papers were legally adequate, further supports the conclusion of Dean's forgery to a clear and convincing degree.

We fail to see that it was necessary for the Perkins to prove the identity of the exact individual who performed the forgery. Nor do we know whether it would even be possible to prove such identity. Dean failed to present *any* handwriting evidence which supported its position or which contradicted plaintiff's expert. Dean did not even cross-examine the Perkins' expert. Dean also failed to present any cogent and unimpeached testimonial evidence suggesting that Lowell Perkins signed the documents.

Neither the court nor the jury are precluded from engaging in their own handwriting comparison and analysis. *See* § 490.640, RSMo 2000. Thus, they are not bound by the expert testimony, even if such testimony is uncontradicted. *See Hemonas v. Orphan,* 191 S.W. 352, 360–61 (Mo.App.1945). However, the capable trial judge never specified this concern, nor has Dean made any such argument related to handwriting comparison in an effort to explain the trial judge's ruling. Therefore, we need not consider whether the trial court could refuse submission of a punitive claim on such a basis.

Dean argues that the trial judge has discretion in evaluating the strength of the evidence, and accordingly the submissibility of the punitive claim, citing *Kaplan v. U.S. Bank,* 2003 WL 1204937 (Mo.App. 2003). The trial judge here may have had credibility concerns, but the record fails to disclose exactly what those concerns may have been. Therefore, we cannot determine from this record that any concerns were such that the trial court could legitimately refuse submission of the punitive claim.

A punitive submission should not be denied because the Perkins seemed less than conscientious as debtors. The poor track record and communication failures of the Perkins may be considered by the jury in evaluating the *value* of the claim for punitive damages. But the performance of the Perkins as debtors should not preclude submission of the claim. The evil motive and the reckless disregard for the legal rights of the Perkins is inherent in the forgery, regardless of the Perkins' pattern of conduct.

This was not a negligence case; it was an intentional tort case. There was no inadvertent or negligent mistake resulting in a trespass and conversion. The evidence of forgery, for the reasons stated above, was clear and convincing. Accordingly, we reverse the judgment as to the punitive damage claim and remand the case for trial of the claim for punitive damages. The other verdicts will stand. Only the punitive claim will be tried. Trial of the punitive claim, of course, may result in a repeat of much of the evidence previously presented.

### Conclusion

For the foregoing reasons, the judgment for Dean on the punitive damages claim is reversed and the case is remanded for trial on the punitive damage claim.

HOWARD and LOWENSTEIN, JJ., concur.