**Richard HOYT and Joan Hoyt, Plaintiffs/Appellants,**

v.

**GE CAPITAL MORTGAGE SERVICES, INC., Defendant/Respondent.**

No. ED 86309.

Missouri Court of Appeals, Eastern District, Division Four.

March 21, 2006.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 25, 2006.

Application for Transfer Denied June 30, 2006.

Andrew Rain Kasnetz, Julia C. Walker, co-counsel, St. Louis, MO, for appellant.

David Taylor Hamilton, Matthew Joseph Fairless, co-counsel, St. Charles, MO, for respondent.

**SHERRI B. SULLIVAN, J.**

*Introduction*

Richard and Joan Hoyt (Appellants, or Mr. Hoyt and Mrs. Hoyt, respectively) appeal from the trial court's judgment. We reverse and remand.

*Factual Background*

In 1991, Appellants moved to Webster Groves from North Carolina and obtained financing with G.E. Capital Mortgage Services, Inc. (Respondent) to purchase a home. Appellants obtained a conventional 30–year mortgage, with an interest rate of 9.25%. The promissory note was secured by a deed of trust on Appellants' home. The promissory note required monthly payments of $1,316.29 beginning on August 1, 1991, to be applied to interest before principal. The promissory note provided for a late fee to be incurred if the full amount of the required payment was not received by the fifteenth (15th) of each month. Mr. Hoyt interpreted the deed of trust to require Respondent to apply payments in the following manner: (1) to the escrow account, (2) to interest, (3) to principal, and (4) to late charges.

Appellants made regular monthly payments but testified that they learned by letter dated September 14, 1995, that their loan was in default. Respondent demanded payment of $3,696.58 to cure the default and reinstate the loan. Respondent had not been applying Appellants' monthly mortgage payments to their account, but instead had been placing them into a "suspense account." Respondent had been holding $3,200.00 of payments Appellants had made toward the promissory note in the suspense account. The promissory note did not mention any "suspense account."

Respondent testified that suspense accounts are used in the mortgage industry when a customer makes partial payments. Fannie Mae guidelines provide that when a partial payment is made, the bank can either send the payment back to the customer or place that amount in "suspense" and inform the customer of the payment's shortfall. When a suspense account is used, the partial payment is placed in suspense and not applied until a full payment is made. A payment that does not include the previously charged late fee may, in the bank's discretion, be considered a partial payment. Respondent testified that suspense accounts are used by virtually all of the members of the Mortgage Bankers Association and have been used for twenty to thirty years in the mortgage industry. Respondent maintains that in Appellants' situation, their monthly mortgage payments were placed in "suspense" because they were not payments in full.

In response to the letter from Respondent, Appellants sent a certified letter to Emmath Echols (Echols), Senior Loan Counselor at Respondent, and reported the issue to the Missouri Division of Finance. In their letter, they demanded that Respondent: (1) credit payments to their account; (2) supply written notice of the credits; (3) notify credit agencies of adjustments to their account and provide copies of the notices; (4) provide a complete accounting of their escrow account and (5) provide a complete listing of all late charges. In response to Appellants' demands, Respondent sent Appellants a copy of the loan history of another client of Respondent's.

The Division of Finance responded to Appellants' complaint, causing Respondent to agree to remove late charges, allowing Appellants to pay only the amount that was past due in escrow due to an increase in taxes, and show the account as current.

Respondent ultimately waived the late fees included in the $3,696.58.

In November 1995, after learning that the amount of their escrow payment had increased, Appellants sent a payment by certified mail in the amount of $1,716.00 to Respondent. The certification receipt indicated that Respondent received the November payment on the sixteenth (16th) of the month. Later, while examining their loan payment history, Appellants learned that Respondent had not credited their November 1995 payment to their account and had assessed late fees every month starting in November of 1995 for the next three-and-a-half (3½) years, despite payments being made within the grace period. In addition to the late fees, Respondent placed approximately $1,100.00 of each monthly payment in "suspense." The funds held in "suspense" were not credited to Appellants' escrow account, principal or interest on their loan for any month, though each and every check cleared.

Appellants continued to make their monthly payments to Respondent and, in November 1998, Respondent began returning the checks to Appellants without cashing them or applying them to the escrow account, principal or interest. Again, on March 8, 1999, Appellants contacted Respondent asking that the irregularities with their account be cured and requested documentation that Respondent notified the credit bureaus that Appellants' account was current. Around March 15, Appellants received a Notice of Trustee's Foreclosure Sale stating that they were in default and their home would be sold to the highest bidder on April 6. The notice, in addition to being mailed to Appellants, was published in the newspaper. Publication of the Notice of Trustee's Foreclosure Sale aroused the interests of various people who called and drove by Appellants' home. After the first notice of foreclosure was

published, Appellants also began receiving solicitations in the mail from various groups and individuals, offering to help them avoid foreclosure. With foreclosure on their home weeks away, Appellants obtained counsel, and the sale was postponed and, ultimately cancelled.

On June 8, 1999, Appellants and Respondent entered into a settlement agreement, which provided that Respondent would forbear from demanding further payment, waive outstanding late fees, and retract reports of default and foreclosure it had made to credit bureaus. The settlement agreement required Appellants to re-tender payments from November 1998 through May 1999 that had been returned to them. Regular payment was to commence in June 1999, and Appellants made their June payment by having their check couriered to Respondent's foreclosure counsel, Rebecca Dennis (Dennis). Respondent received the June payment and credited it to Appellants' account.

Shortly thereafter, Appellants received correspondence from Respondent dated July 1, 1999, stating, "notification has been transmitted to the credit bureaus to make the appropriate changes. Your updated credit report will reflect the account as current with foreclosure started."

Appellants again had their July payment couriered to Dennis's office. The receptionist at Dennis's office signed for the check on July 15, but Dennis testified she did not receive it. Respondent sent Appellants a delinquency notice dated July 16, 1999, stating that because their July payment was not yet received, they were incurring a late fee. Respondent continued to assess late charges on Appellants' account for the next several months, and Appellants continued to inform Respondent they were being wrongfully charged.

In February 2000, Appellants were notified that their February payment had not been credited to their account, though they had sent it on February 8th. On March 13, 2000, Mrs. Hoyt again wrote to Respondent stating that the account still had not been credited with the July 1999 and February 2000 payments and requesting that the credits be made and the credit bureaus be notified of the corrections.

On April 24, 2000, Respondent's successor trustee, Kozeny & McCubbin Trustee Company ("Kozeny McCubbin"), sent Appellants another notice of default and Notice of Publication for the foreclosure sale, which advised Appellants that they had 30 days from receipt of the letter to take action, but stated the trustee may "proceed with the foreclosure against you without waiting the 30 days." The letter from Kozeny McCubbin was addressed to Jane Doe. The published notice identified Appellants by name. Appellants again received several solicitations for lender services in the mail. Appellants continued to make their monthly payments after the notice of foreclosure, but Respondent returned the checks. The scheduled foreclosure was subsequently terminated.

Around September 28, 2000, Appellants received their third notice that foreclosure proceedings were underway and the foreclosure sale on their house was to be held on October 19, 2000. Again, the published notice of sale identified them by name. Appellants enlisted the help of their attorney to stop foreclosure proceedings and began paying the trustee directly. Appellants submitted to the trustee the payments that had been returned to them, beginning with the February 2000 payment.

On October 10, almost two weeks after the September 28 correspondence from Kozeny McCubbin notifying Appellants of the trustee's sale, Respondent sent Appellants another notice that their loan was

delinquent, containing an itemization of the amount due, which included $979.25 in late fees, $247.50 in other fees and costs, and $5,240.37 in legal fees. Appellants did not dispute that they owed the principal, interest and escrow listed in the October 10 letter, because they had submitted payment but the checks had been returned to them. Paragraph 8 of the letter stated that delivery of the reinstatement amount, a total of $22,482.59, constituted acceptance of Respondent's terms.

Rather than paying the entire amount, a portion of which was disputed, and accepting the terms of the letter, Appellants sought an injunction to stop the sale. The foreclosure did not go forward. Since initiation of the third foreclosure, Wells Fargo Home Mortgage, Inc. ("Wells Fargo"), which began servicing the loan July 1, 2001, has continued to assess late fees against Appellants and seek attorneys' fees from them, even though Appellants have made all their payments by the fifteenth (15 th) of every month since January 2001. A representative of Wells Fargo was unable to explain why, in August 2001, Appellants' mortgage payment coupon indicated $1,110.77 in late fees.

On at least three occasions, Mr. Hoyt sought refinancing or credit and found he was not qualified due to the foreclosure proceedings on his property. In June 1999, the prevailing interest rates were lower than the rate on Appellants' loan. Appellants' loan carried a 9.25% rate, while the prevailing rate at the time was around 6%. Refinancing for a shorter term would have reduced Appellants' monthly payments as well as the interest rate on the loan. The difference between Appellants' rate on a 30–year mortgage and a 15–year mortgage at the prevailing rate was a savings of approximately $134,000.00.

Mr. Hoyt discussed the possibility of refinancing with a lender at his bank. At that time, he learned he would not be able to refinance until the foreclosure dispute was resolved and his credit report repaired. Several months later, Mr. Hoyt applied for an American Express Optima Platinum card and did not receive the card. The correspondence denying his credit application stated that his application did not score enough points to qualify him for an American Express Card because of (1) Delinquency reported on accounts, (2) Frequent delinquency, (3) Delinquency date too recent, or unknown, and (4) Insufficient number of satisfactory accounts. In early 2000, Mr. Hoyt applied for a credit card from First USA, which told him "We regret that we are unable to approve your request at this time for the following reason(s): Historical Delinquency On Bureau; Reported Charge Off, Bad Debt, Or Collection(s)." Mr. Hoyt testified that the foreclosure proceedings also changed his role in his neighborhood and community, stating: "[Y]ou can't go though three separate foreclosure proceedings and not have a significant portion of your community and the people that live around you be aware of that, and I've always had the sense that it has certainly impacted my reputation, as well as my ability to relate to my friends and neighbors ... It's humiliating, to say the least."

Mrs. Hoyt also testified that the foreclosure proceedings had caused her to seek medical help. Dr. Judith Tindall (Tindall), a psychologist, testified that Mrs. Hoyt's interaction with Respondent, among other reasons, may have contributed to her medical problems.

*Procedural Background*

Appellants filed an 11–Count Petition in the Circuit Court of the City of St. Louis against Respondent, Kozeny McCubbin,

and Wells Fargo. The Petition sought relief for fraud, negligent misrepresentation, unjust enrichment, intentional interference with credit expectancy, three counts of defamation, breach of contract as to the note, breach of contract as to the deed of trust, breach of contract as to the 1999 settlement agreement, and invasion of privacy.

During discovery, Appellants sought information from Respondent regarding revision of loan instruments generally utilized in the industry, including the identity of any Respondent officer competent to testify about the revision process and Respondent's role in it. Respondent responded that it knew of no such officer. On New Year's Eve, three days before trial was to begin, Respondent produced documents in response to Appellants' previous discovery requests, a number of which were entered into evidence. These documents detailed the Mortgage Bankers Association's efforts, in cooperation with Respondent and other lenders, to amend the standard deeds of trust used for home loans in order to "clarify duties of lenders and borrowers; and to protect against the recent waive of class action law suits." The proposed amendments specifically addressed partial payments and order of payment.

The documents also referred to Thomas Kleissler (Kleissler), who was counsel for Respondent, and who advocated a "complete rewrite" of the deed of trust generally used throughout the lending industry. Kleissler's identity was not disclosed to Appellants until these documents were produced, and even then, counsel for Respondent acknowledged that he was not familiar with Kleissler.

Trial in this matter began on January 3, 2005. Kozeny McCubbin had settled with Appellants prior to trial, and Wells Fargo settled before the close of all the evidence.

After closing arguments, Appellants submitted six (6) counts against Respondent, two (2) counts each of intentional interference with credit expectancy, defamation, and breach of contract. Appellants sought punitive damages for their two (2) interference with credit expectancy counts and two (2) defamation counts.

Although the trial court stated that it found that there was substantial evidence of intentional interference with credit expectancy and submitted those claims to the jury, it directed a verdict on punitive damages for those claims. The jury found in favor of Appellants on both of their interference with credit expectancy claims, awarding them $68,168.00 in actual damages; in favor of Appellants on their pre–1999 defamation claim but in favor of Respondent on the post–1999 defamation claim, awarding Appellants nothing; and in favor of Appellants on their breach of contract claims, awarding them $14,000.00.

Counsel for Appellants objected to the jury's verdict on the pre–1999 defamation claim as inconsistent, in that it awarded no damages, and counsel for Respondent agreed. The trial court directed the jury to deliberate further. After further deliberation, the jury returned a second time, again failing to assess any damages. Appellants' counsel renewed his objection, and also pointed out that the verdict was now incomplete as well. The trial court then polled the jury and asked the jury if their verdict was that "[w]e, the undersigned jurors, assess the damages of plaintiffs Joan and Richard Hoyt at nothing." Ten of the jurors responded that that verdict was correct and the trial court entered judgment in favor of Respondent.

After the trial court's entry of judgment, Appellants moved for a new trial and Respondent moved for judgment notwithstanding the verdict on the jury's verdicts in favor of Appellants. The trial court

overruled these motions. On April 19, the trial court entered a judgment and order rescinding the parties' 1999 settlement agreement. In so doing, the trial court found that Respondent had failed to perform its duties under the agreement, primarily by never retracting from the credit bureaus its report of Appellants' default and foreclosure, and that Appellants had fulfilled their duties under the agreement. The trial court ordered Appellants to return to Respondent the $2000.00 they had received under the agreement, and extinguished the parties' obligations under the agreement, thereby rescinding it.

### Points on Appeal

In their first point, Appellants assert that the trial court erred in refusing to submit punitive damages to the jury on Appellants' intentional interference claims because Appellants met the standard of submissibility in that there was substantial evidence of improper means.

In their second point, Appellants maintain that the trial court erred in entering judgment in favor of Respondent on Appellants' pre–1999 defamation claim because the jury's verdict on this claim was in favor of Appellants, and was incomplete and inconsistent because it found Appellants were damaged by Respondent's actions, found Respondent was liable for punitive damages, but had nothing written in the blank for actual damages.

### Standard of Review

■ Whether there is sufficient evidence for an award of punitive damages is a question of law. *Perkins v. Dean Machinery Co.,* 132 S.W.3d 295, 299 (Mo.App. W.D.2004). We review the evidence presented to determine whether, as a matter of law, it was sufficient to submit the claim for punitive damages. *Id.* In doing so, we view the evidence and all reasonable infer-

ences in the light most favorable to submissibility. *Id.* A submissible case is made if the evidence and the inferences drawn therefrom are sufficient to permit a reasonable juror to conclude that the plaintiff established with convincing clarity—that is, that it was highly probable—that the defendant's conduct was outrageous because of evil motive or reckless indifference. *Id.*

■ In reviewing a directed verdict in favor of the defendant, we view the evidence and all reasonable inferences therefrom in the light most favorable to the plaintiff's case. *Id.* at 297.

### Analysis

#### Substantial Evidence of Improper Means

■ The test to be applied in determining whether malice existed as a basis for the award of punitive damages is whether the defendant did a wrongful act intentionally and without just cause or excuse. *Beggs v. Universal C.I.T. Credit Corp.,* 409 S.W.2d 719, 722 (Mo.1966). This means that the defendant not only intended to do the act which is ascertained to be wrongful but that he knew it was wrongful when he did it. *Id.* There must be, in order to justify punitive damages, some element of wantonness or bad motive, but if one intentionally does a wrongful act and knows at the time that it is wrongful he does it wantonly and with a bad motive. *Id.* Furthermore, an evil intent may be implied from reckless disregard of another's rights and interests. *Id.* at 723.

■ In reviewing the issue of submissibility of punitive damages, we look at the evidence which is favorable to the submission of punitive damages, disregarding all evidence and inferences which are adverse thereto. *Fabricor, Inc. v. E.I. DuPont de Nemours & Co.,* 24 S.W.3d 82, 96–97 (Mo.

App. W.D.2000). Only evidence that tends to support the submission should be considered. *Id.*

■ For intentional tort cases, punitive damages require a showing of a culpable mental state on the part of the defendant, either by a wanton, willful or outrageous act or reckless disregard, *from which evil motive is inferred,* for an act's consequences. *Fabricor,* 24 S.W.3d at 96–97; *Burnett v. Griffith,* 769 S.W.2d 780, 787 (Mo.banc 1989) (emphasis added). It is not so much the commission of the intentional tort as the conduct or motives, i.e., the defendant's state of mind which prompted its commission, that form the basis for a punitive damage award. *Burnett,* 769 S.W.2d at 787.

■ We find that Appellants made a submissible case for punitive damages. The following evidence presented by Appellants and the inferences drawn therefrom are sufficient to permit a reasonable juror to conclude that Appellants established that it was highly probable that Respondent's conduct was outrageous because of reckless indifference. See *Lopez–Vizcaino v. Action Bail Bonds, Inc.,* 3 S.W.3d 891, 893 (Mo.App. W.D.1999).

Respondent acknowledged there was no mention of a suspense account in the Deed of Trust but stated that it used one anyway. Respondent's non-disclosure of this material term ultimately led to the diversion of Appellants' funds away from their intended payment of principal, interest, and escrow payments, causing their loan to become delinquent.

Once Respondent categorized Appellants' loan as delinquent, it initiated foreclosure proceedings on Appellants' home. Even after the 1999 settlement agreement, wherein Respondent promised to retract reports of Appellants' alleged default from the credit bureaus, it not only failed to do so, but advised the credit bureaus that foreclosure proceedings had been started. Respondent repeatedly refused to correct the information it submitted to credit reporting agencies about Appellants' loan.

Respondent also ignored correspondence from Appellants. When it did respond to Appellants' request for a copy of their loan history, it supplied the loan history of another borrower. Respondent failed to provide timely accounting of the escrow account, and failed to do so at the Appellants' request, thus keeping them ignorant as to why their payments were not considered full payments, why checks were cashed but payments were not credited to their account and why late fees were assessed.

We conclude that Respondent's non-disclosure of the suspense account and its use of it; constant refusals to acknowledge Appellants' requests for information about their account; failure to retract damaging reports that were submitted to credit bureaus, but in fact acting to reinforce them, create the inference that Respondent was recklessly disregarding the consequences of its actions and thereby damaging Appellants' creditworthiness.

The trial court found these facts sufficient to permit the jury to find that Respondent had employed improper means by falsely reporting defaults to credit agencies. Based on this evidence, the trial court also found that Appellants made submissible cases for defamation and punitive damages relating to that defamation. Based on this evidence, we find that the trial court should *also* have found that Appellants made a submissible case for punitive damages based on their intentional interference with credit expectancy claims. Point I is granted.

*Inconsistent Verdict on Punitive Damages*

In their second point, Appellants maintain that jury's verdict on their pre–1999 defamation claim was inconsistent and in-

complete because it found Appellants were damaged by Respondent's actions, found Respondent was liable for punitive damages, but had nothing written in the blank for actual damages.

■ The jury instruction for the pre–1999 defamation claim for which the jury found in favor of Appellants provided as follows:

Your verdict must be for plaintiffs if you believe:

First, GE Mortgage did one or more of the following:

Reported to credit bureaus that Plaintiffs were delinquent under the Note and Deed of Trust, or

Published the Notice of Trustee's Sale (Exhibit 11), and

Second, GE Mortgage was at fault in reporting such statement, and

Third, such statement tended to expose plaintiffs' [sic] to one or more denials of credit, or deprived the plaintiffs of public confidence and social associations, and

Fourth, such statement was read by plaintiffs' neighbors, real estate speculators, potential lenders or the public, and

Fifth, *plaintiffs' reputation was thereby damaged....*

(Emphasis added).[1] The fifth element of this instruction conforms to the rule that recovery on a slander claim requires a showing of actual damages. *Nazeri v. Missouri Valley College,* 860 S.W.2d 303, 313 (Mo.banc 1993). Accordingly, the jury's finding in Appellants' favor on this claim meant the jury found Appellants were damaged. However, the jury failed to assess an amount of damages. Once a plaintiff offers evidence to support a finding on all the elements of MAI 23.06(1), including the existence of actual damages, he is entitled to damages of such sum as will fairly and justly compensate him for any damages he sustained as a result of the defamation. *Kennedy v. Jasper,* 928 S.W.2d 395, 400 (Mo.App. E.D.1996)

■ Not only did the jury have to find that Appellants were damaged in order to find for them on their pre–1999 defamation claim, but the jury also determined that Respondent was liable for those damages, and punitive damages as well. The jury's award of no damages starkly contradicts its finding of Respondent's liability and Appellants' damages and renders its verdict inconsistent. See *Downey v. Univ. Internists of St. Louis,* 154 S.W.3d 339, 343 (Mo.App. E.D.2004). By finding in favor of Appellants but assessing no damages, the jury's verdict on Appellants' pre–1999 defamation claim is internally inconsistent. See *Jenkins v. Revolution Helicopter Corp., Inc.,* 925 S.W.2d 939, 942 (Mo.App. W.D.1996).

■ It is incumbent upon the trial court to examine the jury's verdict for

---

1. Instruction 13 was modeled after Missouri Approved Instructions (MAI)—Civil 6th 23.06(1) (1980 New), which provides:

Your verdict must be for plaintiff if you believe:

First, defendant (*describe act such as "published a newspaper article"*)

containing the statement (*here insert the statement claimed to be libelous such as "plaintiff was a convicted felon"*), and [1]

Second, defendant was at fault in publishing such statement, and

Third, such statement tended to [expose plaintiff to (*select appropriate term or terms such as "hatred", "contempt" or "ridicule"*)] [or] [deprive the plaintiff of the benefit of public confidence and social associations],[2] and

Fourth, such statement was read by (*here insert name of person or persons other than plaintiff or the appropriate generic term such as "the public"*), and

Fifth, plaintiff's reputation was thereby damaged.

* [unless you believe plaintiff is not entitled to recover by reason of Instruction Number ....... (*here insert number of affirmative defense instruction*)].

defects and inconsistencies. *Welsh v. Burlington N. R.R. Co.*, 719 S.W.2d 793, 798 (Mo.App. E.D.1986). A jury verdict must be clear and unambiguous so that judgment may be entered upon it without resorting to inference. *Morse v. Johnson*, 594 S.W.2d 610, 617 (Mo.banc 1980). In the instant case, the trial court was inferring what the jury's verdict was when it asked the jury if their verdict, as plainly written, meant that the jury assessed Appellants' damages to be nothing.

Based on the foregoing, Point II is granted.

The trial court's directed verdict on Appellants' claims for punitive damages in conjunction with their intentional interference claims is reversed. The trial court's judgment entered on the jury's verdict on Appellants' pre–1999 defamation claim also is reversed. This cause is remanded for proceedings consistent with this opinion.

NANNETTE A. BAKER, P.J., and ROBERT G. DOWD, JR., J., concur.