**Tracy GILLILAND, Appellant,**

v.

**MISSOURI ATHLETIC CLUB, Respondent.**

**No. SC 88950.**

Supreme Court of Missouri, En Banc.

Jan. 13, 2009.

---

Donald K. Murano, Kurt Cummiskey, St. Louis, for Appellant.

Peter J. Dunne, Jessica L. Liss, Rabbitt, Pitzer & Snodgrass, P.C., St. Louis, for Respondent.

## Introduction

MICHAEL A. WOLFF, Judge.

Tracy Gilliland sued the Missouri Athletic Club under the Missouri Human Rights Act alleging he was sexually harassed by another male, a manager for the club. The jury returned a verdict for $60,000 in actual damages for "constructive discharge" and a verdict declaring the athletic club liable for punitive damages. The trial court entered judgment for Gilliland on the verdict, granted the athletic club judgment notwithstanding the verdict on punitive damages, awarded Gilliland $22,000 in attorneys' fees, and denied equitable relief.

The case was submitted to the jury on Gilliland's claims that the athletic club discriminated against him on the basis of sex and race, that a club manager had sexually

harassed and assaulted him in the workplace, and that he was constructively discharged. The constructive discharge claim, which was not submitted to the jury under the human rights act, was the only claim on which the jury found in favor of Gilliland. On Gilliland's other claims, the jury found in favor of the athletic club.

This case comes here solely on Gilliland's appeal of the judgment notwithstanding the verdict on punitive damages, the denial of equitable relief in the form of "front pay" benefits or reinstatement, and the allegedly inadequate attorneys' fee award. The Missouri Athletic Club chose not to appeal and satisfied the judgment, which included the $60,000 in damages.

### Facts

Tracy Gilliland worked as a server at the Missouri Athletic Club in St. Louis from 1999 until 2002. While working at the athletic club, Gilliland was subjected to inappropriate touching and harassment by Vincent Millen, the club's operations manager of food and beverage. Gilliland testified that Millen engaged in inappropriate physical contact on an almost daily basis by "tweaking" Gilliland's nipples, making thrusting motions while holding Gilliland by the waist, grabbing at Gilliland's penis, pulling Gilliland's head toward Millen's groin, using vulgar language, and making inappropriate jokes and comments in Gilliland's presence. In addition to Millen's inappropriate contact with Gilliland, Gilliland testified that he witnessed Millen touch the breasts of several female employees. Gilliland testified that other club employees were aware of Millen's inappro-

priate behavior and that, on one occasion, he witnessed Millen touch the breast of a female employee in the presence of the athletic club's human resource director, Christine Maurer, and two other female human resource employees.

In response to Millen's inappropriate behavior, Gilliland asked Millen to desist and registered a complaint with Gilliland's immediate supervisor. He also complained to Millen's supervisor, as well as to a member of the club's Board of Governors. Despite Gilliland's complaints, however, Millen's conduct persisted. Finally, Millen's behavior motivated Gilliland to resign his position.

Gilliland alleged that the athletic club discriminated against him on the basis of sex (sexual harassment) and race, and that Millen had assaulted and sexually harassed him in the workplace. Gilliland, who is white, based his claim of race discrimination on the club's failure to promote him when it promoted a black person instead. Following trial, the jury returned a verdict in favor of Gilliland on his claim of constructive discharge and awarded Gilliland $60,000 in actual damages. On all of Gilliland's other claims, as noted, the jury found in favor of the athletic club. The jury also found that the club was liable for punitive damages relating to the constructive discharge claim.

Gilliland's claim for punitive damages was bifurcated pursuant to section 510.263.[1][2] As such, the jury's verdict included only a finding of liability for punitive damages. The verdict did not specify an amount because, under the statute, the amount of punitive damages was to be

---

1. All statutory references are to RSMo 2000.

2. Section 510.263 provides that a punitive damage action "shall be conducted in a bifurcated trial before the same jury if requested by any party." Section 510.263.1. "If during the first stage of a bifurcated trial the jury determines that a defendant is liable for punitive damages, that jury shall determine, in a second stage of trial, the amount of punitive damages to be awarded against such defendant." *Id.* at subsection 3.

determined in a second trial. However, because the trial court entered judgment notwithstanding the verdict denying punitive damages for Gilliland's constructive discharge claim, a separate trial on the amount of punitive damages never took place.

Following trial, Gilliland filed motions for attorney's fees and equitable relief in the form of "front pay," benefits or reinstatement.[3] The trial court overruled Gilliland's motion for equitable relief and awarded Gilliland $22,000 in attorney's fees. Following opinion in the court of appeals, this Court granted transfer and has jurisdiction. Mo. Const. art. V, sec. 10.

### The trial court's entry of a judgment on the issue of punitive damages

■ Gilliland argues that the trial court erred in entering judgment notwithstanding the verdict on the athletic club's liability for punitive damages. Whether there is sufficient evidence to support an award of punitive damages is a question of law, and this Court's review is de novo. Hoyt v. GE Capital Mortgage Services, Inc., 193 S.W.3d 315, 322 (Mo.App.2006); 75A AM. JUR.2D Trial § 627 (2008).

■ Section 213.111.2 permits recovery of punitive damages in claims brought un-der the Missouri Human Rights Act.[4] Under Missouri law, a plaintiff is entitled to punitive damages if the plaintiff proves by clear and convincing evidence that the defendant's conduct was outrageous because of the defendant's evil motive or reckless indifference to the rights of others. Burnett v. Griffith, 769 S.W.2d 780, 787 (Mo. banc 1989) (quoting RESTATEMENT 2D OF TORTS SEC. 908(2) (1979)); Brady v. Curators of University of Missouri, 213 S.W.3d 101, 107 (Mo.App.2006).

There is a fundamental problem with Gilliland's position in this appeal: After the jury's verdict, he no longer has a claim recognized under the Missouri Human Rights Act. The jury rejected his claims for sexual harassment and race discrimination, as well as his claim for assault, an intentional tort.

The jury instruction that separately submitted a claim for constructive discharge did not submit a claim for constructive discharge based on sexual or racial harassment or discrimination causing a hostile work environment. In fact, the jury instruction made no reference to any discriminatory conduct prohibited by the human rights act, such as was included in the other claims separately submitted to the jury.[5] With his constructive discharge

---

**3.** The term "front pay" describes "a lump sum ... representing the discounted present value of the difference between the earnings [an employee] would have received in his old employment and the earnings he can be expected to receive in his present and future, and by hypothesis inferior, employment." McKnight v. General Motors Corp., 908 F.2d 104, 116 (7th Cir.1990). Although reinstatement is a preferable remedy in claims brought under the human rights act, Missouri courts have held that when reinstatement is not feasible, the court may grant front pay as an alternative equitable remedy. Brady v. Curators of University of Missouri, 213 S.W.3d 101, 113–14 (Mo.App.2006) (citing Altenhofen v.

Fabricor, Inc., 81 S.W.3d 578, 594 (Mo.App. 2002)).

**4.** Section 213.111.2 provides that "[t]he court may grant as relief, as it deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order, and may award to the plaintiff actual and punitive damages." Id. (emphasis added).

**5.** The trial court submitted the following jury instruction for Gilliland's claim of constructive discharge: "On plaintiff Tracy Gilliland's claim of constructive discharge your verdict must be for plaintiff and against defendant Missouri Athletic Club if you believe: First,

claim, Gilliland simply sought to recover because Millen's "unwelcome conduct" made the work atmosphere so hostile that Gilliland was constructively discharged.

▮ But the act provides no basis for recovery for an unwelcome or hostile work environment in and of itself—that is, in the absence of discrimination as a factor in the hostile work environment leading to the constructive discharge. As with demotions, firing, and other forms of "adverse employment action," constructive discharge based on a hostile work environment merits relief under the act only if the plaintiff can establish a discriminatory motive for the constructive discharge.[6] *Gamber v. Missouri Dept. of Health and Senior Services*, 225 S.W.3d 470, 477 (Mo.App. 2007). *See also Penn. State Police v. Suders*, 542 U.S. 129, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004) (discussing constructive discharge in the context of federal discrimination claims under Title VII). A showing of constructive discharge negates the theory that the victim quit voluntarily.[7] *Pollock v. Wetterau Food Distribution Group*, 11 S.W.3d 754, 764 (Mo.App.1999); 14A CJS CIVIL RIGHTS sec. 216 (2008). But

in order to prevail, the plaintiff must show that the constructive discharge or other adverse employment decision was motivated by discrimination against a category protected by the anti-discrimination statute at issue which, under the Missouri Human Rights Act, includes race, color, religion, national origin, sex, ancestry, age or disability. Section 213.055. In other words, a hostile work environment is not a basis for relief under the Missouri Human Rights Act unless the hostility is directed at the victim because of his or her race, color, religion, national origin, sex, ancestry, age or disability.[8] *Id.*

While the act is not implicated in the absence of any claim of discrimination, a common law claim of constructive discharge based on other types of allegedly intolerable working conditions was recognized in *dictum* in *Bell v. Dynamite Foods*, 969 S.W.2d 847, 853 (Mo.App.1998). The validity of Gilliland's constructive discharge claim, however, is not before this Court because the athletic club paid the judgment and did not appeal.

▮ The jury's verdict in favor of the athletic club on the grounds of sexual

---

plaintiff Tracy Gilliland was subjected to unwelcome conduct by defendant Vincent Millen which was sufficiently severe and pervasive to create a hostile work environment that a reasonable person in plaintiff Tracy Gilliland's position would find to be hostile, intimidating or offensive, and; Second, the exclusive reason plaintiff Tracy Gilliland resigned his employment was as a direct result of such hostile work environment, and; Third, as a direct result of such conduct, plaintiff Tracy Gilliland sustained damage."

6. At trial, Gilliland argued that the constructive discharge was an adverse employment action within the purview of the Missouri Human Rights Act and that the hostile work environment that led to the constructive discharge was caused by the discriminatory acts of Millen. The jury instruction, however, does not mention any category protected by the human rights act.

7. A showing that an employee's resignation was voluntary rather than forced makes the employee ineligible for reinstatement, back pay or damages. *Pollock* at 764.

8. The Missouri Human Rights Act, like Title VII, prohibits sexual harassment regardless of the sex of the claimant or the harasser. *Oncale v. Sundowner Offshore Services*, 523 U.S. 75, 82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (holding that sex discrimination consisting of same-sex harassment is actionable under Title VII). In other words, the human rights act protects individuals against sexual harassment, a form of sex discrimination, by members of either the same sex or the opposite sex. *State ex rel. Dean v. Cunningham*, 182 S.W.3d 561, 563 (Mo. banc 2006); *see also Mason v. Wal–Mart Stores, Inc.*, 91 S.W.3d 738 (Mo.App.2002); *Barekman v. City of Republic*, 232 S.W.3d 675 (Mo.App.2007).

harassment and race discrimination eliminated any of the protected grounds—which Gilliland claimed—as a basis for its decision. Because there is no viable claim for actual damages under the human rights act, there is no basis for punitive damages under the act.

The question remains whether punitive damages are available for a claim under a common law constructive discharge theory. The conduct that Gilliland cites in support of his constructive discharge claim is the same conduct as he cites in support of his sexual harassment claim, which the jury rejected. Section 213.111.2 specifically authorizes punitive damages for human rights act claims, and it does not seem appropriate, in light of the statute, to recognize a claim for punitive damages on facts that the jury determined did not support a claim under the act. It does appear that Gilliland is trying to argue that the constructive discharge violates the act, but he lost on that theory.

■ What Gilliland has is an intentional tort theory that sounds like a human rights act case. But, as noted, it is not a human rights case. Even if there is, as the *Bell dictum* suggests, a common law claim for constructive discharge in the absence of discrimination or a claim under the act, Gilliland's claim does not qualify because *Bell* says that such a claim must be based upon a violation of public policy. 969 S.W.2d at 852. The constructive discharge jury instruction here was premised on the athletic club's hostile environment. Gilliland did not base his case on the theory that a hostile environment is a violation of public policy. A hostile work environment may involve conduct that is extremely rude, but unless it is based on conduct prohibited by law—in this case, sexual harassment as prohibited by the human rights act—it is not a violation of public policy.

On this record, it appears the parties and the trial courts were treating this as a human rights case. In these circumstances, it is inappropriate to apply a punitive damages remedy under the common law to a claim whose legitimacy and applicability are not before the Court on this appeal. The common law cannot be developed so haphazardly. *See* Oliver Wendell Holmes, THE COMMON LAW (1881).

The Missouri Athletic Club's decision to pay the judgment entered on the verdict—even though the verdict rested on grounds not recognized under the act—was a strategic choice. Had the athletic club pursued its appeal, an appellate court may have concluded that the jury verdicts were inconsistent and that a new trial was warranted. In view of the facts of the case, recited above, a retrial might have resulted in a larger award and possibly punitive damages, given the outrageous nature of the acts at least as Gilliland portrays them, plus attorneys' fees well in excess of the $22,000 the club was assessed by the trial court. Similarly, Gilliland's decision not to raise issues as to the jury's denial of recovery on the basis of sexual harassment, race, and assault was a strategic choice. If Gilliland had raised these issues—which would have highlighted the possibility that the jury's verdicts were inconsistent—he may not have received the payment of the judgment.[9]

Because of the strategic choices of both parties, this Court has no choice but to affirm the trial court's judgment notwithstanding the verdict on the simple ground that there no longer was a claim under the

9. It appears that both sides agreed upon the jury instructions that the trial court submitted. Nevertheless Gilliland or the athletic club might have sought a new trial on the basis of the inconsistent verdicts.

human rights act on which punitive damages could be awarded, regardless of how outrageous the jury believed the conduct of the club and its manager to have been. The Court similarly declines the opportunity to endorse a common law punitive damages remedy on this record.

### Attorney's Fees

■ Gilliland argues that the trial court erred in awarding only $22,000 in attorney's fees. He asks that this Court remand the issue of attorneys' fees to the trial court with directions that the trial court "make a full award of attorneys' fees." Attorneys' fees are authorized for a prevailing party under the Missouri Human Rights Act. Section 213.111.2. The trial court treated the application for attorneys' fees as a request under the statute. Section 213.111.2 is structured to recognize attorneys' fees as a matter of course to prevailing claimants. Respondents, on the other hand, must demonstrate the case "is without foundation" in order to collect attorney's fees under the statute.[10] This is similar to a federal counterpart, 42 U.S.C. 1988, under which attorneys' fees are recovered ordinarily unless there are circumstances that would render an award of such fees unjust. *See Hensley v. Eckerhart*, 461 U.S. 424, 429, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). While the determination of reasonable attorneys' fees is in the sound discretion of the trial court, *Nelson v. Hotchkiss*, 601 S.W.2d 14, 21 (Mo. banc 1980), appellate courts have expressed a number of factors to be considered. For instance, *Williams v. Finance Plaza, Inc.*, identified these factors as relevant to an award of statutorily authorized fees: 1) the rates customarily charged by the attorneys involved in the case and by other attorneys in the community for similar services; 2) the number of hours reasonably expended on the litigation; 3) the nature and character of the services rendered; 4) the degree of professional ability required; 5) the nature and importance of the subject matter; 6) the amount involved or the result obtained; and 7) the vigor of the opposition. 78 S.W.3d 175, 184, 187 (Mo.App.2002). *Cf. Hensley*, 461 U.S. at 429–430, 103 S.Ct. 1933, footnote 3 (identifying 12 factors).

In arguing that the trial court abused its discretion in awarding only $22,000, Gilliland asserts that his actual attorneys' fees are $170,149.50. In its order, the trial court stated its belief, based on the fact that the total award for actual damages was only $60,000, that $22,000 represented a reasonable amount of attorneys' fees. In explaining its rejection of Gilliland's calculation, the trial court stated that it "believes the hours expended were excessive given the relatively straightforward nature of the case."

■ In human rights cases, the amount of the verdict or judgment may have little bearing on the amount of attorneys' fees. The act recognizes the public purpose served by litigation that vindicates the rights of those who are discriminated against. The Missouri legislature, in enacting the human rights act, followed the lead of Congress in the choice of authorizing fees to private attorneys for enforcement of human rights claims, rather than relying principally upon government agencies for such enforcement. In human rights cases, therefore, courts should consider the factor identified as number 5, above, the nature and importance of the subject matter. A court also might consid-

---

10. Section 213.111.2 states that the trial court "may award court costs and reasonable attorney fees to the prevailing party, other than a state agency or commission or a local commission; except that, a prevailing respondent may be awarded court costs and reasonable attorney fees only upon a showing that the case is without foundation." *Id.*

er the extent to which a plaintiff prevailed on some claims and not on others, as the trial court apparently did in this case. The efforts of the prevailing attorneys, however, should not be discounted where the effort and proof were the same for the claims on which Gilliland prevailed and those on which he did not. *See Hensley,* 461 U.S. at 451, 103 S.Ct. 1933. This is especially true where the attorneys obtained complete relief for the client on the claims that were successful. *Id.*

Gilliland succeeded on one claim—for constructive discharge—that he assumes was a recovery under the human rights act, an assumption that may have been shared by the trial court. But in actuality, Gilliland succeeded on none of his claims under the human rights act. In view of the trial court's stated reasons for the award, Gilliland's appeal of the amount of the attorneys' fee award might have been well taken—if he had prevailed on one of his human rights act claims. He did not so prevail. The trial court's judgment as to attorneys' fees is affirmed.

### Front Pay

Gilliland also appeals the trial court's overruling of his motion for equitable relief. Specifically, Gilliland argues that the trial court erred in denying his request for "front pay" to compensate for the future wage losses Gilliland incurred as a result of the athletic club's constructive discharge.

Front pay is an equitable remedy, an offshoot of the court's equitable power to grant reinstatement and otherwise make whole a victim of discrimina-

tion. Where reinstatement is not feasible, such as in this case where the employer-employee relationship cannot be repaired through reinstatement, a court under section 213.211.1 can consider front pay in lieu of reinstatement.

As an equitable remedy, the decision to award or deny front pay falls within the discretion of the trial court. *Brady* at 114. Here, the trial court determined that front pay was unnecessary because the jury's award of $60,000 sufficiently compensated Gilliland for his loss.

It is not necessary to ascertain whether the trial court abused its discretion. This Court reiterates that there was no jury finding in Gilliland's favor on any of his human rights act claims. Nor was there any basis asserted for the trial court to grant equitable relief on findings of fact that differ from the jury's decision on the ultimate facts that found no actionable discrimination.[11] Accordingly, no equitable relief was available.

### Conclusion

The trial court's judgment against the athletic club was not appealed. Gilliland did not prevail on any of his claims under the Missouri Human Right Act or on the assault claim, nor did he challenge the jury's findings by moving for a new trial on those claims. Without a human rights claim, he has no claim for punitive damages under the act, nor does the record support a common law claim for punitive damages.

The judgment of the trial court is affirmed.

11. In *State ex rel. Leonardi v. Sherry,* 137 S.W.3d 462 (Mo. banc 2004), this Court discussed the right to jury trial in cases involving both legal and equitable claims. The Court held that, "[u]nless circumstances clearly demand otherwise, trials should be conducted to allow claims at law to be tried to a jury, with the court reserving for its own determination only equitable claims and defenses, which it should decide consistently with the factual findings made by the jury." *Id.* at 473.

STITH, C.J., PRICE, RUSSELL and BRECKENRIDGE, JJ., and DALLY and HARDWICK, Sp.JJ., concur.
TEITELMAN and FISCHER, JJ., not participating.