In the Missouri Court of Appeals
 Eastern District
 DIVISION THREE

LYNNE HARRISON, )
 )
 Respondent, ) No. ED109012
 )
vs. ) Appeal from the Circuit Court
 ) of the City of St. Louis
HARRIS-STOWE STATE ) Case No. 1722-CC01238
UNIVERSITY, )
 )
 Appellant, ) Honorable Christopher E. McGraugh
 )
and )
 )
EMMANUEL LALANDE and )
TAMMY BRAMWELL-KIMBROUGH, ) Filed: May 4, 2021
 )
 Defendants. )

 The defendant, Harris-Stowe State University, appeals the judgment entered by the

Circuit Court of the City of St. Louis following a jury verdict in favor of the plaintiff, Lynne

Harrison, under the Missouri Human Rights Act (“MHRA”) for retaliatory discharge.

 We affirm the trial court’s judgment on Harrison’s claim for actual damages from the

University for retaliation under the MHRA as well as the trial court’s award of attorneys’ fees.

We reverse the award of litigation expenses, and remand to the trial court to consider which, if

any, of the out-of-pocket expenses of Harrison’s attorneys can be properly awarded as attorneys’
fees pursuant to our Supreme Court’s decision in Wilson v. Kansas City.1 Finally, we grant

Harrison’s request for reasonable attorneys’ fees on appeal, and remand to the trial court to

determine and enter an appropriate award.

 Factual and Procedural Background

 Viewed in the light most favorable to the verdict, the following evidence was adduced at

trial. In the summer of 2015, Harris-Stowe State University sought a new director for its

Department of Public Safety to be in charge of campus security and command the University’s

private security force. Plaintiff Lynne Harrison learned of the position available at the University

and applied.

 Harrison began her career in law enforcement as a cadet with the University City Police

Department. She later graduated from the St. Louis Police Academy where she was the first

woman and first person of color elected as a class president. Harrison then joined the St. Louis

County Police Department in 1978. Eventually, she left law enforcement, and moved to Virginia,

obtaining bachelor’s and master’s degrees in criminal justice from Virginia State University.

 After obtaining her degrees, Harrison taught at Virginia State University, several

community colleges, and as a professor with the FBI Academy. During her teaching career, she

undertook specialized training, including training in the preparation of Clery reports. These are

federally-mandated public reports detailing crime statistics on college campuses. An institution’s

failure to properly prepare and file its annual Clery report can result in significant federal fines.

Annual Clery reports are due October 1.

 Harrison was teaching summer courses in Virginia when she learned of the job opening

for the Director of Public Safety at the University. She interviewed for the position in July 2015,

1
 598 S.W.3d 888 (Mo. banc 2020).

 2
undergoing interviews with numerous University officials, including the president, Dr. Dwaun

Warmack, Dean Emmanuel Lalande, Assistant Dean Shawn Baker, and Human Resources

Director Tammy Bramwell-Kimbrough. When Dr. Warmack met one-on-one with Harrison, he

did not discuss her qualification, rather he emphasized the physically strenuous nature of the job

and questioned whether Harrison was capable of the job’s physical demands. Harrison would

eventually be told that Dr. Warmack had not wanted to hire a woman as the Director of Public

Safety.

 The University offered Harrison the position in late July 2015, and she accepted.

Harrison planned to move to St. Louis and officially join the University on October 5, 2015;

however, the University’s Clery report was due October 1. Even before being placed on the

University’s payroll, Harrison flew to St. Louis, collected the confidential information required

for the Clery report, returned to Virginia, and prepared the Clery report from scratch for timely

filing with the federal government.

 Harrison officially began her job with the University on October 5. On her first day in the

office, the University required Harrison to sign a form acknowledging that she was hired on the

basis of a 90-day probationary period. A University employee terminated after completing

probation would be entitled to an internal appeal process. After moving across the country, this

was the first that Harrison heard of a probationary period for her employment. Harrison was told

that if she did not acknowledge the probationary period by signing the required form, she would

not be employed by the University. Harrison signed the form.

 Harrison immediately encountered difficulties at the University. On October 7, 2015,

Harrison sent a complaint to her immediate supervisor, Dean Lalande, regarding Tammy

Kimbrough and the Human Resources Department with the subject “Passive Aggressive,

 3
obstructionist and unprofessional conduct in the public safety department.” In her October 7

memo, Harrison complained to Lalande about problems communicating with the Human

Resources Department, namely “misdirected emails, reported not received emails, the pattern of

non-responsive emails, confusing emails and unprofessionally drafted emails” that raised

concerns for Harrison about potential civil liability for the University. In addition, Harrison

expressed concerns about the 90-day probationary period, and “unnecessary passive aggressive

tactics” taken by human resources in communicating with Harrison in finalizing her employment

paperwork. Harrison was first instructed to contact no one in the Human Resources Department

other than Kimbrough. Harrison was then instructed not to contact the Human Resources

Department at all, but to go through Lalande instead.

 On October 16, Harrison again complained to Lalande about Kimbrough and others in the

Human Resources Department. Harrison characterized her memorandum to Lalande as

“Notification of Filing of Discriminatory Practices and Creating a Hostile Workplace” on behalf

of herself, individually, and the members of the Department of Public Safety, collectively.

Harrison complained of an incident where Kimbrough had “created an extreme hostile work

environment by forcing herself past the staff members of the Department of [Public] Safety and

attempting to knock down the door to the office of the Director of Public Safety because she

demanded to be seen immediate[ly].” Harrison’s memorandum went on to complain of “systemic

discriminatory practices and procedures” implemented by Kimbrough as to Harrison and

members of the Department of Public Safety. As to problems affecting members of her

department, she cited “reduced/missing or incorrect payroll and the interference of officers in the

procedure of the performance of their duties that can result in bodily injury.”

 4
 Harrison testified that Kimbrough and Lalande were close. Kimbrough told Harrison

multiple times that she was a vice-president with the power to fire employees. Lalande instructed

Harrison and Kimbrough to meet and try to resolve their differences. The two met in

Kimbrough’s office along with human resources attorney Rhonda Wesley. Following the

meeting, Harrison complained to Lalande on October 20 that Kimbrough engaged in “[h]ostile,

physically threatening” behavior and intimidated Harrison with a threat of unwarranted

discharge. Harrison, Kimbrough, Lalande, and Dr. Warmack met on October 21 to address the

conflict, but the situation remained unresolved.

 On November 23, 2015, Harrison complained to Dean Lalande about another

confrontation with Kimbrough in which Kimbrough was yelling in the Department of Public

Safety office, and yelled directly in Harrison’s face. Harrison wrote that “if another aggressive

event concerning M[s] Kimbrough takes place in this work environment, a formal incident

requesting a threat assessment investigation will be filed.” (Emphasis in original).

 On December 9, Harrison wrote Dean Lalande requesting an independent investigation

into “the level of violence perpetuated by Tammy Kimbrough.” She also complained about

Lalande’s dismissive attitude concerning her conflict with Kimbrough:

 Many attempts have been made to address this issue unsuccessfully only to escalate Ms.
 Kimbrough’s behavior and to add insult to injury the events be identified as a “girl fight.”
 That is demeaning and insulting not only to me as a woman but, to the position I hold as
 Director of Public Safety. … [Ms. Kimbrough] and her office has (sic) engaged in
 systemic discrimination and obstructive actions that has impeded the functioning of my
 department and my ability to supervise and produce the highest level of performance in
 my department. … I have been required to use a separate discriminatory communication
 process concerning any request/contact from the Human Resource Department in the
 performance of my job duties that is a violation of law.

In a separate memorandum of the same date, Harrison complained to Lalande regarding the

“[p]assive [a]gressive, obstructionist and unprofessional conduct in the public safety department”

 5
by Kimbrough and another human resources employee because they told Harrison to go through

Lalande in order to interview and hire additional public safety officers. She also emailed Lalande

on December 9, pointing out that she had “endured discriminatory practices, verbal

abuse/physical aggression and threats of termination just for performing my duties as it pertains

to my position as Director of Public Safety.”

 Harrison again emailed Lalande two days later requesting the status of her complaint

about “the discriminatory actions and behaviors of f[e]llow employee Tammy Bramwell

Kimbrough.” She again complained of Lalande’s dismissive attitude that the conflict between

Harrison and Kimbrough was simply “[t]wo pretty girls fighting for attention.” Sometime in

early December, Lalande told Harrison not to email or text him any longer, to only speak with

him one on one in his office because he believed Harrison was setting up a paper trail for him

with her complaints.

 At trial, Kimbrough acknowledged that she was convicted of committing crimes

involving theft and dishonesty, and served a prison sentence before joining the University.

According to Kimbrough’s testimony, Harrison knew of the convictions, and she believed

Harrison was investigating her. Kimbrough had an employee with the University’s information

technology department provide her with a printout of Harrison’s computer activity, which

purportedly revealed contact with the court systems of states where Kimbrough once lived. An

FBI agent and an investigator from the postmaster’s office came to the University to speak with

Kimbrough on one occasion. She testified that “at that point I was through the ceiling with the

entire situation. I reported it to Dean Lalande. I reported it to Dr. Warmack.” Kimbrough was

asked to resign by Dr. Warmack, purportedly to avoid bad publicity, and received a $35,000

severance package. Kimbrough left the University in December 2015.

 6
 Lalande testified that Harrison also drew the anger of some faculty members. Lalande

received complaints from the University’s dance coach and from its athletic director about

conflicts occurring with Harrison in front of students and members of the public. Lalande

described a tense encounter he had with Harrison in public at the homecoming concert regarding

crowd control and complaints of persons, including donors to the University, being denied

admission to the concert. Because of the complaints from faculty members, it was reasonable for

the jury to infer that others were involved in the decision to fire Harrison.

 In addition to her written complaints, Harrison testified about frequent comments

throughout her employment concerning her age and sex. She stated that she was regularly called

“girl” and “old woman.” On learning that Harrison was 61 years old, Lalande said, “[w]e didn’t

know you were that old. How did you get in here?” Harrison interpreted this to be a negative

comment about her age, given that Lalande and most of the people hired by the University’s

current administration were under the age of 40. Lalande also instructed Harrison to fire her

secretary, Clarice Poindexter, because Poindexter was “slow” and “old.” When Harrison refused,

Lalande directed her to restructure Poindexter’s job so that she would be unable to perform it

satisfactorily.2

 Lalande told Harrison he’d never seen a woman score so highly on the leadership ability

exam that Harrison was required to take for her job. He also made comments that Harrison was

“too cute” and “too feminine” to be a police officer, but should use it to her advantage if

possible. Once, when Lalande received an answer from Harrison that he did not care for, he

commented that it must be that time of the month. Lalande also characterized the conflict with

Kimbrough as two light-skinned girls fighting to be campus queen. Public Safety Officer Keith

2
 Poindexter was deceased at the time of trial.

 7
McGull testified that he observed interactions between Harrison and Lalande. He stated that

Lalande often belittled Harrison, and denied her due respect as the head of the Department of

Public Safety. At some point, Lalande began to bypass Harrison, and went directly to her male

subordinates, telling them not to share information with Harrison.

 By mid-December 2015, Harrison was hearing rumors that she would be fired. Harrison

testified that she heard these rumors from people outside of her work area whom she did not

know well. Nevertheless, Lalande assured Harrison her job was secure. Harrison was especially

worried about her job security because she had given up her teaching career and life in Virginia,

moved halfway across the country, and just signed an 18-month lease on an expensive apartment

close to the University so that she could respond anywhere on campus within ten minutes.

 Harrison traveled to Virginia at the end of the semester for part of the University’s winter

break. She returned to work on December 31, 2015, and communicated with Lalande, who was

on vacation in Florida, throughout the day. At about 4:00 p.m. on December 31, the 88th day of

Harrison’s 90-day probationary period, the University terminated her employment. Under

direction from Lalande, Assistant Dean Baker accompanied by public safety officers McGull and

Lieutenant Ricky Perry delivered a ten-page termination letter to Harrison, and demanded the

return of her keys. Harrison at first believed that Baker was playing a joke on her, and refused to

turn over her keys. As it dawned on her that it was no joke, Harrison became extremely upset,

eventually collapsed or fell, and went to the hospital via ambulance.

 The letter stated that Harrison was terminated for insubordination, failure to meet

expectations outlined in the job description, and lack of institutional fit. It outlined nine areas in

which Harrison had failed to meet expectations: (1) obtain a license to carry a firearm through

the Watchman’s Division of the St. Louis County Police Department; (2) provide training for

 8
Public Safety staff regarding “use of force, reporting, community policing, zones, etc.”; (3)

provide training for Public Safety staff and campus community regarding active shooters; (4)

prepare a Department of Public Safety Standard of Operations Manual; (5) form a threat-

assessment team; (6) complete a crisis/emergency response plan; (7) prepare protocols for the

Department of Public Safety, such as a “General Orders System, protocols for dispatchers, call

log, reporting, call system, etc.”; (8) build positive relationship with key University offices; and

(9) assist in the ongoing placement of cameras on the campus. By the time of her firing, Harrison

had, in addition to her day-to-day duties, prepared the University’s federally-mandated Clery

report, assembled a threat-assessment team and compiled its training manual, prepared a

communication protocol manual, talked with her officers about training related to use of force

and community policing, begun preparing a standard of operations manual for the Department of

Public Safety, and scheduled officer training with the FBI.

 Harrison sued the University, Lalande, and Kimbrough for hostile work environment,

tangible employment action, and retaliation on the bases of age, gender, and color under the

MHRA. Harrison dismissed her claims against Kimbrough, and proceeded to trial against the

University and Lalande. At trial, Harrison argued that the University left her with no choice but

to sue because she could not pursue her complaints through the normal channels by going either

to the University’s Human Resources Department or her immediate supervisor. Harrison

submitted to the jury six claims against Lalande and the University for age or gender

discrimination, hostile work environment based on age or gender, and retaliatory discharge based

on complaints of age or gender discrimination. The jury found in favor of Lalande on every

claim, and in favor of the University on the claims of discrimination and hostile work

environment. The jury found in favor of Harrison on her claim of retaliatory discharge against

 9
the University, and awarded her $32,000 in compensatory damages. The jury awarded no

punitive damages. The trial court entered judgment in conformity with the jury’s verdicts.

 After having filed motions for directed verdict at the close of Harrison’s evidence and at

the close of all of the evidence, the University filed a motion for judgment notwithstanding the

verdict. Harrison filed a motion for attorneys’ fees, costs, and post-judgment interest under the

MHRA. The trial court found “astonishing” Harrison’s request for attorneys’ fees of $698,369

with a 1.5 multiplier for total attorneys’ fees requested of $1,047,553.50. Citing excessive hourly

rates for Harrison’s lead attorneys, excessive billing for a third partner to work on the case,

ambiguous billings, apparent duplicative billing, billing for an internal firm matter relating to an

attorney’s departure, and billings totaling more than 20 hours per attorney per day for several

days, the trial court reduced the billed amount of attorney’s fees to $371,210. The court then

applied a multiplier of 1.25 for a total fee award of $464,012.50. The trial court also awarded

Harrison $6,483.51 for costs and litigation expenses. Thus, the trial court’s amended order and

judgment dated May 1, 2020 entered judgment in favor of Harrison on her claim of retaliation

against the University with an award of actual damages of $32,000, entered judgment in favor of

the defendants on Harrison’s five other claims, awarded Harrison’s counsel $464,012.50 in

attorney’s fees, and awarded Harrison $6,483.51 in costs and litigation expenses. The University

appeals.

 Discussion

 In five points on appeal, the University challenges the trial court’s judgment entered in

favor of Harrison on her claim of retaliatory termination against the University, and the award to

Harrison of attorneys’ fees and litigation expenses. Harrison has submitted to this Court a motion

for attorneys’ fees on appeal.

 10
 In its first three points, the University challenges the trial court’s denial of its motion for

judgment notwithstanding the verdict (JNOV). In Point I, the University claims that it cannot be

held liable for Harrison’s retaliatory termination because the jury found in favor of Lalande—the

employee whom the University maintains made the sole decision to fire Harrison—on the

retaliatory termination claim against him, thus rendering inconsistent verdicts. In its second and

third points, the University argues that the evidence was insufficient to establish that the

University discharged Harrison for engaging in the protected activity of submitting complaints of

discrimination or that those complaints had a causal relationship to her discharge.

 In its last two points, the University challenges the award of attorneys’ fees and expenses.

In Point IV, the University challenges the trial court’s award of attorneys’ fees to Harrison, and

the application of a multiplier of 1.25. In its fifth point, the University claims the trial court erred

in awarding $6,483.51 as litigation expenses in view of the Missouri Supreme Court’s recent

decision in Wilson v. City of Kansas City.

 Standard of Review

 In Points I through III, the University challenges the trial court’s denial of its motion for

JNOV. We review the denial of a motion for judgment notwithstanding the verdict in essentially

the same manner as we review the denial of a motion for directed verdict. Lin v. Ellis, 594

S.W.3d 238, 241 (Mo. banc 2020). When reviewing the denial of a motion for JNOV, we must

determine whether the plaintiff presented a submissible case by offering evidence to support

each element necessary for liability. Id. We review the evidence in the light most favorable to the

jury’s verdict. Id.

 In Point IV, the University challenges the trial court’s calculation and award of attorneys’

fees to Harrison. We review the trial court’s award of attorneys’ fees for an abuse of discretion.

 11
DeWalt v. Davidson Serv./Air, Inc., 398 S.W.3d 491, 506 (Mo. App. E.D. 2013). We will reverse

the trial court’s determination only when the amount awarded is arrived at arbitrarily or is so

unreasonable that it indicates indifference and a lack of proper judicial consideration. Id.

 In Point V, the University claims the trial court erred in awarding Harrison $6,483.51 in

reimbursement for litigation expenses. Whether a statute authorizes an award of costs is a

question of statutory interpretation that we review de novo. Wilson, 598 S.W.3d at 894.

 Inconsistent Verdicts and the McGinnis Doctrine

 In its first point, the University claims the trial court erred in entering judgment for

Harrison and in denying the University’s motion for judgment notwithstanding the verdict

(JNOV) because the verdicts were inconsistent. The University contends that under the

McGinnis Doctrine, the court should have entered JNOV in favor of the University because: (1)

the jury found in favor of Lalande on the retaliation claim against him; (2) the retaliation claim

against the University was premised on respondeat superior, based only on Lalande’s conduct

surrounding his termination of the plaintiff’s employment; and (3) Lalande was the sole decision

maker in the termination decision.

 Under the McGinnis Doctrine, “when a claim is submitted on the theory of respondeat

superior and the jury returns inconsistent verdicts, exonerating the employee, but holding against

the employer, the court must grant the employer judgment notwithstanding the verdict.” Burnett

v. Griffith, 739 S.W.2d 712, 713 (Mo. banc 1987) (citing McGinnis v. Chicago, R.I. & P. Ry.

Co., 98 S.W. 590 (Mo. 1906)). However, the McGinnis Doctrine does not apply unless the

employer’s liability depends entirely on the conduct of the exonerated employee. See id. (stating

doctrine does not apply to claims that base liability on a theory other than respondeat superior).

 [U]nless the liability of the master is based solely on the negligence of the particular
 servant who is sued and acquitted, that is if the master is guilty of negligence distinct

 12
 from the negligence or tort of the servant, though combining with it, or the injury is due
 in whole or in part to the negligence of other servants than the one sued, then an acquittal
 of the servant sued does not nullify the verdict and judgment may go against the master.

Stith v. J. J. Newberry Co., 79 S.W.2d 447, 458 (Mo. 1934).

 Our Supreme Court’s decision in Burnett v. Griffith is instructive. In Burnett, an off-duty

police officer employed as a security guard by two private companies arrested the plaintiff. 739

S.W.2d at 712-14. The plaintiff sued the security guard and his employers for assault, false

imprisonment, and malicious prosecution. Id. at 712-13. On the assault claim, the jury returned a

verdict in favor of the plaintiff and against all three defendants. Id. at 713. On the false

imprisonment and malicious prosecution claims, however, the jury returned verdicts in favor of

the security guard, but finding his employers liable and awarding damages. Id. The Supreme

Court explained how such a result could be upheld for the malicious prosecution claim but not

for the false imprisonment claim. Id. at 715-16.

 Applying the McGinnis Doctrine, the Court held that the jury’s verdict exonerating the

security guard on the false imprisonment claim necessarily exonerated his employers because the

plaintiff based his claim solely on the conduct of the security guard. Id. at 715. Thus, the only

theory of liability against the employers was respondeat superior based on the actions of that one

security guard. Id. In contrast, the Supreme Court held that the verdict in favor of the security

guard did not exonerate his employers on the malicious prosecution claim. Id. at 716. The

plaintiff did not base that claim solely on the conduct of the security guard, but also on the

conduct of others employed by the defendant companies involved in the decision to prosecute the

plaintiff. Id.

 Also instructive is Devine v. Kroger Grocery & Baking Company. There, a customer

claimed she was injured at Kroger’s grocery store, and sued Kroger, the store manager, and the

 13
building owner. 162 S.W.2d 813, 815 (Mo. 1942). The Court stated that when the employer’s

liability is not predicated solely on the negligence of the employee in whose favor a verdict has

been rendered, but is based on the negligence of another employee, or that of the employer, a

verdict against the employer is not inconsistent. Id. at 817. A verdict in favor of an employee

does not bar recovery against the employer when the employer itself committed acts on which

liability may be based independently of acts committed by the employee. Id.

 Here, the University contends there was no evidence from which a reasonable jury could

find that any University employee other than Lalande played any role in the decision to terminate

Harrison. The University argues the retaliation claim was based solely on the conduct of

Lalande, which must be excluded under the McGinnis Doctrine because the jury found him not

liable. As the University observes, the question is whether Harrison’s theory of liability

depended wholly on the conduct of Lalande, or whether there was evidence that others employed

by the University were involved in the decision to terminate Harrison. The record contains

evidence from which a reasonable jury could find that University employees other than Lalande

played a role in Harrison’s retaliatory discharge.

 Harrison’s petition originally named Kimbrough as a defendant, but she was dismissed

from the action before trial. The petition alleged that Harrison “was subjected to severe and

pervasive discrimination and retaliation based on her age, gender, race, and color by one or more

agents and/or employees of Defendant [the University] including, but not limited to,” the

defendants Lalande and Kimbrough. Harrison further alleged that the University and Lalande

had “engaged in a pattern and practice of discriminating against employees over the age of forty

(40)”; that the University and Lalande had “engaged in a pattern and practice of consistently

discriminating against females and favoring and/or promoting male employees over female

 14
employees”; and that the University failed to take remedial action regarding Lalande’s conduct,

in effect condoning, ratifying, or authorizing it. During opening and closing statements, Harrison

argued that as an older woman who spoke up for her rights and those of others, she was not a

good “fit” at the University. Harrison argued:

 [T]here is a preference here for a certain type of leader, certain type of candidate: A
 young, African American male and someone who will fall in line. Who won’t make too
 much noise. Who won’t make bad press. Who won’t ruin what we got going here by
 speaking up and speaking out, even about outlandish behavior.

 The evidence reveals that Harrison encountered difficulties with several University

employees in addition to Lalande whom the jury could have inferred played a role in the decision

to terminate Harrison. That by mid-December, Harrison heard rumors from people outside of her

work area that she would be fired is just one fact supporting such an inference.

 There was extensive evidence that Harrison and Kimbrough had significant conflict from

the beginning of Harrison’s employment. While Kimbrough was not Harrison’s supervisor, she

nevertheless “outranked” Harrison, being a member of the executive committee and a vice-

president, reporting directly to the University president, Dr. Warmack. Lalande forwarded

Harrison’s October 20, 2015 email about her conflict and failed one-on-one meeting with

Kimbrough to Dr. Warmack, and a meeting was arranged for Harrison, Kimbrough, Lalande, and

Dr. Warmack on October 21. The meeting did not resolve any of the difficulties between

Kimbrough and Harrison, and the situation worsened. Although Kimbrough testified to a much

different version of events than did Harrison, the jury alone, as the trier of fact, is the sole arbiter

of witness credibility, and is free to believe or disbelieve all, part, or none of any witness’s

testimony. State v. Armstrong, 560 S.W.3d 563, 574 (Mo. App. E.D. 2018).

 Kimbrough acknowledged that she had been convicted of committing crimes involving

theft and dishonesty and had served a prison sentence before joining the University. According

 15
to Kimbrough’s testimony, Harrison knew of the convictions, and she believed Harrison was

investigating her. Kimbrough had an employee with the University’s information technology

department provide her with a printout of Harrison’s computer activity, which purportedly

revealed contact with the court systems of states where Kimbrough once lived. An FBI agent and

an investigator from the postmaster’s office came to the University to speak with Kimbrough on

one occasion. She testified that “at that point I was through the ceiling with the entire situation. I

reported it to Dean Lalande. I reported it to Dr. Warmack.” Kimbrough was asked to resign by

Dr. Warmack, purportedly to avoid bad publicity, and received a $35,000 severance package. 3

Kimbrough left the University in December 2015. Lalande terminated Harrison on December 31,

2015.

 Both Lalande and Kimbrough were members of the executive committee, and reported

directly to Dr. Warmack. Harrison testified that Kimbrough and Lalande were very close, and

that Kimbrough called Lalande by the nickname “Manny.” Lalande told Harrison that

Kimbrough voted against hiring her. Kimbrough told Harrison multiple times that she was a

vice-president with the power to fire employees. The jury reasonably could have inferred that

Kimbrough, the Director of Human Resources, played a role in Lalande’s decision to terminate

Harrison’s employment. Likewise, the jury reasonably could have inferred that Kimbrough, as

well as persons in the administration with concerns about details of Kimbrough’s background

becoming public, could have influenced the decision to fire Harrison.

 In addition, Harrison testified that her in-person interview with Dr. Warmack struck her

as odd. Whereas every other person with whom Harrison interviewed asked questions about her

qualifications, Dr. Warmack did not. Instead, he focused on Harrison’s physical ability to

3
 Indeed, Kimbrough testified that a St. Louis newspaper published an article on Mother’s Day 2016 about her
background and employment at the University.

 16
perform the job. Lalande later told Harrison that Dr. Warmack had not wanted to hire a woman

for the position of Director of Public Safety. While the University obviously hired Harrison

knowing she was a woman, the jury could have found that Dr. Warmack’s reluctance to hire

Harrison made her position more tenuous from the beginning of her employment, and made it

easier for her to be fired during her probationary period.

 Harrison also drew the anger of some faculty members. Lalande received complaints

from the University’s dance coach and from its athletic director about conflicts occurring with

Harrison in front of students and members of the public. Lalande described a tense encounter he

had with Harrison in public at the homecoming concert regarding crowd control and complaints

of persons, including donors to the University, being denied admission to the concert. Evidence

of complaints from faculty members, could have led the jury to reasonably infer that others were

involved in the decision to fire Harrison.

 Based on this evidence, the jury reasonably could have concluded that other University

employees played a role in the decision to terminate Harrison. The jury could reasonably infer

under all of the circumstances that the conduct of other employees, either independent of

Lalande’s conduct or in conjunction with it, was sufficient to hold the University liable, even

though the jury believed the conduct of Lalande alone did not rise to the level of liability. See

Stith, 79 S.W.2d at 458 (“[I]f the master is guilty of negligence distinct from the negligence or

tort of the servant, though combining with it, or the injury is due in whole or in part to the

negligence of other servants than the one sued, then an acquittal of the servant sued does not

nullify the verdict and judgment may go against the master.”).

 Similar to the malicious prosecution claim in Burnett and the negligence claim in Devine,

Harrison’s retaliation claim was not based solely on the conduct of a single employee. It was for

 17
the jury to determine whether other University employees were involved in Lalande’s decision,

and the jury reasonably determined this to be true. Therefore, the verdicts exonerating Lalande

but finding the University liable for retaliation were not so inconsistent as to require the trial

court to enter judgment notwithstanding the verdict. We deny the University’s first point.

 Harrison’s Engagement in Protected Activity

 For the sake of clarity, we next address the University’s third point. The University

claims the trial court erred in entering judgment for Harrison on her retaliation claim against the

University and in denying the University’s motion for JNOV. The University contends that

Harrison failed to present sufficient evidence that she engaged in activity protected under the

MHRA because none of her complaints to Lalande about Kimbrough alleged that Kimbrough’s

actions were motivated by Harrison’s age, race, or gender. The University points out that none of

Harrison’s complaints, documented in her trial exhibits, attributed any of Kimbrough’s actions to

illegal discrimination based on Harrison’s age or gender. The University further argues that

Harrison’s memoranda to Lalande, including her allegation that he dismissed the conflict with

Kimbrough as a “girl fight,” never alleged that he discriminated against Harrison because of her

age or gender.

 Section 213.070(2) RSMo. (2000)4 makes it an unlawful discriminatory practice “to

retaliate or discriminate in any manner against any other person because such person has

opposed any practice prohibited by this chapter.” Under the facts presented here, Harrison could

establish a case for retaliation under the MHRA by showing that: (1) she complained of or

otherwise opposed discrimination; (2) the University took adverse action against her; and (3) a

causal relationship exists between the complaint and the adverse action. McCrainey v. Kansas

4
 All statutory references are to RSMo. (2000).

 18
City Missouri Sch. Dist., 337 S.W.3d 746, 753 (Mo. App. W.D. 2011). Our Supreme Court has

held that if an employee’s protected activity was even one contributing factor in the defendant’s

decision to take an act of reprisal against the employee, then there has been unlawful retaliation.

Walsh v. City of Kansas City, 481 S.W.3d 97, 106 (Mo. App. W.D. 2016).

 A plaintiff can oppose a practice that is not ultimately found to be unlawful under the

MHRA, yet still proceed with a retaliation claim based on her opposition to the practice.

McCrainey, 337 S.W.3d at 753. By providing a retaliation cause of action, section 213.070 of the

MHRA encourages employees to report and oppose potentially discriminatory conduct. Id. at

753-54. If an employee were required to be certain that the conduct was unlawful before she

reported it, an uncertain employee would be less likely to oppose conduct that the MHRA may in

fact prohibit. Id. at 754. Therefore, in order to prevail on a retaliation claim, a plaintiff need only

have a good faith, reasonable belief that the MHRA prohibited the conduct she opposed. Id.

 Here, the University challenges the sufficiency of the evidence to establish the first

element of a retaliation claim. Reviewing the evidence in the light most favorable to the jury’s

verdict, Lin, 594 S.W.3d at 241, we find the evidence sufficient to establish that Harrison

opposed or complained of specific conduct in a good-faith, reasonable belief that the MHRA

prohibited such conduct. In other words, there was sufficient evidence for the jury to find that

Harrison complained of or otherwise opposed discrimination and a hostile work environment

motivated by age or gender.

 First, we observe that Harrison’s opposition to discriminatory conduct and practices was

not limited to her complaints about Kimbrough’s behavior. Harrison testified that during her first

week at the University, Lalande told her to fire Clarice Poindexter, a secretary whom Lalande

described as “old” and “slow.” Harrison refused to fire Poindexter, so then Lalande instructed

 19
her to change Poindexter’s job description so that Poindexter could not perform successfully.

Again, Harrison refused.

 Likewise, Harrison testified that when she expressed concerns about Kimbrough’s

behavior, Lalande dismissed the conflict as two light-skinned girls fighting to be campus queen.

The jury could have believed that Lalande’s description of the conflict reflected his

understanding of Kimbrough’s motivations. Thus, the jury could have found that Harrison’s

complaints about Kimbrough’s conduct were, in fact, complaints of gender discrimination. Even

more specifically, Harrison included in her December 9 and December 11, 2015 memos to

Lalande a complaint about this cavalier dismissal of her concerns, writing that Lalande’s

response was demeaning and insulting to her as a woman.

 An immediate result of Harrison’s early complaints about Kimbrough’s behavior was that

Lalande directed Harrison not to contact human resources as all other University employees were

entitled to do. Rather, he instructed Harrison to go through him for all human resources matters,

both for those of Harrison personally and those related to the Department of Public Safety in

general.

 Further, following Harrison’s complaints, Lalande began to bypass Harrison, going

directly to her male subordinates, namely Lieutenant Perry who assumed Harrison’s position

when she was discharged. Officer McGull testified that he observed Lalande belittle Harrison,

and deny her due respect as the head of the Department of Public Safety. In early December,

Lalande told Harrison not to email or text him any longer, to speak with him one on one in his

office only. He stated that he believed Harrison was laying a paper trail for him with her

complaints.

 20
 Any of this evidence was sufficient for the jury to find that Harrison was fired because

she complained about or otherwise opposed instances of what she reasonably and in good faith

believed to be discrimination protected by the MHRA. We deny the University’s third point.

 Causal Relationship Between Harrison’s Complaints and Her Termination

 In its second point, the University claims the trial court erred in entering judgment for

Harrison on her retaliation claim against the University and in denying the University’s motion

for JNOV. The University contends that Harrison failed to present sufficient evidence that her

engagement in protected activity caused or contributed to her termination because Lalande was

the sole decision maker, and because the jury found the evidence insufficient to find that

Harrison’s complaints contributed to Lalande’s decision to terminate her.

 The University’s argument to support this point does not address the sufficiency of the

evidence to support a causal relationship between Harrison’s protected activity and her

termination. The University instead reiterates that Lalande was the sole decision maker, and so

the verdict against the University cannot stand. We have already rejected the University’s

contention that Lalande was necessarily the sole decision maker, determining that the jury

reasonably could have found that other University employees were involved in Lalande’s

decision to terminate Harrison.

 To establish a case for retaliation under the MHRA, Harrison was required to show a

causal relationship between her protected activity and her termination. Walsh, 481 S.W.3d at

105-06; McCrainey, 337 S.W.3d at 753. Our Supreme Court has held that if an employee’s

protected activity was even one contributing factor in the decision to take an act of reprisal

against the employee, then unlawful retaliation has resulted. Walsh, 481 S.W.3d at 106.

 21
“Because cases involving claims of retaliatory motive are inherently fact-based and often depend

on inferences rather than direct evidence, circumstantial evidence that tends to support an

inference of retaliatory motive is sufficient.” Holmes v. Kansas City Public Sch. Dist., 571

S.W.3d 602, 611 (Mo. App. W.D. 2018).

 We reject the University’s conclusory statement that the evidence was insufficient to find

that Harrison’s complaints contributed to the decision to terminate her. Viewing the evidence in

the light most favorable to the jury’s verdict, Lin, 594 S.W.3d at 241, we find the evidence

sufficient to establish that the University terminated Harrison as reprisal for her engagement in

MHRA-protected activity. Harrison was fired on New Year’s Eve, the 88th day of her 90-day

probationary period. Had the University terminated Harrison after expiration of her 90-day

probationary period, she would have been eligible for an internal appeal of her termination.

During her 88 days of employment, Harrison refused to take actions against a secretary who was

“old”; complained repeatedly of hostility and obstruction from Kimbrough, who in turn

complained to Lalande and Dr. Warmack about Harrison; complained of the unique procedure

required of her to address human resources matters; and experienced Lelande’s dismissal of her

complaints about Kimbrough, with whom Lalande was close, as a “girl fight” over who would be

“queen” of the campus. In early December, Lalande told Harrison not to email or text him any

longer, to only speak with him one on one because he believed that Harrison was setting up a

paper trail for him.

 Harrison and Lalande differed greatly in their testimony about the progress Harrison had

made in her assignments. The jury alone, as the trier of fact, determines the credibility of the

witnesses, and is free to believe or disbelieve all, part, or none of any witness’s testimony.

Armstrong, 560 S.W.3d at 574. We defer to the jury’s credibility determinations. Thus, it was for

 22
the jury to determine credibility, and by extension to decide whether the University’s defense

that Harrison performed inadequately in her job duties was a pretext for her termination. The jury

reasonably could have inferred from the evidence that persons within the University were

retaliating against Harrison, and wished to fire her before she had any right of review within the

University. We deny the University’s second point.

 Award of Attorneys’ Fees

 In its fourth point, the University claims the trial court erred in its fee award. The

University contends the fee award was excessive because: (1) Harrison prevailed on only one of

six claims submitted; (2) her prevailing retaliation claim required different proof than her five

other claims; (3) the fee request resulted from the failure of Harrison’s counsel to obtain a

continuance and unreliable billing practices; and (4) the case did not justify a lodestar multiplier.

We disagree.

 “[T]he legislature enacted section 213.111.2 to authorize an award of ‘reasonable

attorney fees’ to the prevailing party in an MHRA action.” Wilson, 598 S.W.3d at 896. Under

section 213.111.2, prevailing employees receive an award of attorney fees “as a matter of

course” although prevailing respondents must prove the case was “without foundation” to

receive an award. Gilliland v. Mo. Athletic Club, 273 S.W.3d 516, 523 (Mo. banc 2009). The

authorization for an award of attorney fees under section 213.111.2 is similar to a federal

counterpart, 42 U.S.C. 1988, under which attorneys’ fees are recovered unless circumstances

exist that would render an award of such fees unjust. Id.

 Factors relevant to a trial court’s award of statutory attorneys’ fees are: 1) the customary

rates charged by the attorneys involved in the case as well as by other attorneys in the

community for similar services; 2) the number of hours reasonably expended; 3) the nature and

 23
character of the services rendered; 4) the degree of professional ability required; 5) the nature

and importance of the subject matter; 6) the amount involved or the result obtained; and 7) the

vigor of the opposition. Wilson, 598 S.W.3d at 896.

 The determination of reasonable attorneys’ fees is generally committed to the discretion

of the trial court. Id. We deem the trial court an expert on fees in a given case because of its

familiarity with all of the issues and the character of the legal services rendered. Walsh, 481

S.W.3d at 113. We presume an award of attorneys’ fees is correct, and the complaining party has

the burden to prove otherwise. Id. We will reverse only if the opposing party shows that the

award of attorney fees was against the logic of the circumstances and so arbitrary and

unreasonable as to shock one’s sense of justice. Id.

 Here, the trial court characterized as “astonishing” the fee request submitted by

Harrison’s counsel. The trial court considered the above factors, examined the attorneys’ billing

rates and hours expended, considered the University’s objections, considered application of the

lodestar multiplier, and ultimately awarded 56 percent less than the total amount Harrison’s

attorneys requested. Notably, the trial court cut the hourly billing rate of partners Jeremy

Hollingshead and Nicholas Dudley by 20 percent based on a recent survey of median St. Louis

billing rates and the rate the same attorneys billed in another recent MHRA case. The court also

eliminated 152.4 hours of time billed by unnamed attorneys and staff; eliminated hours billed by

an associate whose time appeared “inexplicably” in the records of both firms representing

Harrison; eliminated the trial preparation fees of a third partner, Thomas SanFilippo; eliminated

42.3 hours of time related to the departure of an associate from one of the firms; and eliminated

128.9 hours of trial time billed by Hollingshead and Dudley. Of the attorneys’ fees submitted by

 24
Harrison’s counsel, the trial court found that a lodestar of $371,210 was reasonable, representing

little more than half the lodestar originally requested.5

 The University contends that the lodestar calculation should be further reduced, arguing

that Harrison’s six claims submitted to the jury each required distinct efforts and proof, and that

her retaliation claim was easier to prove than an actual discrimination claim. The University’s

argument misses the mark. To prevail on her retaliation claim, Harrison had to establish that she

held a good-faith, reasonable belief that the actions she complained of constituted discrimination

prohibited by the MHRA. McCrainey, 337 S.W.3d at 754. Thus, to establish her good-faith,

reasonable belief, Harrison was required to set forth detailed evidence of MHRA-prohibited

discrimination in an effort to prove such discrimination. As this Court explained in DeWalt v.

Davidson Serv./Air, Inc.:

 If the plaintiff’s claims for relief are based on different legal theories and facts, and
 counsel’s work on one claim is unrelated to work on another, then the court should treat
 the unrelated claims as if they had been raised in separate lawsuits. Therefore, the court
 may award no fee for services on the unsuccessful and unrelated claims. On the other
 hand, if the claims for relief have a common core of facts and are based on related legal
 theories, so that much of counsel’s time is devoted generally to the litigation as a whole
 and rendering it difficult to divide the hours expended on a claim-by-claim basis, such a
 lawsuit cannot be viewed as a series of distinct claims. In short, the efforts of the
 prevailing attorneys should not be discounted where the effort and proof were the same
 for the claims on which the plaintiff prevailed and those on which [s]he did not.

398 S.W.3d at 507 (internal citations omitted). Contrary to the University’s argument, Harrison’s

claims of discrimination, hostile work environment, and retaliation cannot be evaluated each in

isolation, but have a common core of facts and are based on related legal theories.

 In addition, proof of discrimination is often complex and reliant on circumstantial

5
 The “lodestar” is the starting point in determining reasonable attorneys’ fees. Terpstra v. State, 565 S.W.3d 229,
250 (Mo. App. W.D. 2019). The trial court determines the lodestar by multiplying the number of hours reasonably
expended by a reasonable hourly rate. Id.

 25
evidence. Presentation of circumstantial evidence is often necessary in discrimination cases

because, as our Supreme Court has stated, “employers are shrewd enough not to leave a trail of

direct evidence.” Terpstra v. State, 565 S.W.3d 229, 244 (Mo. App. W.D. 2019) (quoting Cox v.

Kansas City Chiefs Football Club, Inc., 473 S.W.3d 107, 116 (Mo. banc 2015)).

 Implicit in the University’s argument is the proposition that Harrison’s success was

minimal because she prevailed on only one of six claims submitted to the jury, and that factor

should influence the fee award. However, our Supreme Court has found the sixth factor

identified above—the amount involved or the result obtained—not particularly relevant in

human rights cases. Wilson, 598 S.W.3d at 896. A more significant factor is the nature and

importance of the subject matter because “[t]he Missouri legislature, in enacting the human

rights act, followed the lead of Congress in the choice of authorizing fees to private attorneys for

enforcement of human rights claims, rather than relying principally upon government agencies

for such enforcement.” Id. (quoting Gilliland, 273 S.W.3d at 523).

 The University further argues that the trial court should have eliminated or reduced

Dudley’s fees. The trial court did, indeed, reduce Dudley’s fees, first by reducing his hourly rate

by 20 percent and then by eliminating 63 hours of time billed. Given the trial court’s careful

consideration of the factors necessary for determining the lodestar and the billing records

submitted, we cannot say that the trial court abused its discretion.

 The court then applied a multiplier of 1.25 to the lodestar to reach a total attorneys’ fee

award of $464,012.50. After the trial court calculates the lodestar, it may find that a multiplier is

necessary to ensure a market fee that compensates counsel for taking this case in lieu of working

less risky cases on an hourly basis. Terpstra, 565 S.W.3d at 251. In doing so, however, the court

 26
should avoid awarding a multiplier based on facts it already considered in its initial

determination of the lodestar amount. Id.

 Harrison’s attorneys requested a multiplier of 1.5. The trial court reduced the multiplier

to 1.25. The University argues that no multiplier is warranted because the trial court relied on the

same factors to award a multiplier that it relied on to award attorneys’ fees in the first instance,

namely the risk taken and delay in receiving payment for time and resources devoted to the

litigation. The trial court’s analysis, however, demonstrates that it carefully considered the fee

request and the multiplier, and did not arrive at the multiplier arbitrarily, without proper

consideration, or by relying on the same factors relied on for the lodestar calculation. As a result,

we cannot say that the trial court’s calculation of the multiplier was an abuse of discretion. Id. at

252. We deny the University’s fourth point.

 Award of Litigation Expenses

 The court awarded Harrison $6,483.51 in addition to the award of attorneys’ fees. In one

instance in the judgment, the trial court referred to the $6,483.51 as “costs” and in another

instance as “litigation expenses.” The University claims the trial court erred in separately

awarding these “litigation expenses” because no statute specifically identifies litigation expenses

as court costs. Therefore, contends the University, litigation expenses cannot be taxed as costs

and awarded separately under the MHRA. We agree.

 Twelve days after the trial court issued its amended judgment in this case, our Supreme

Court handed down its opinion in Wilson v. City of Kansas City. “‘An item is not taxable as costs

in a case unless it is specifically authorized by statute’ or by the parties’ contract.” Wilson, 598

S.W.3d at 895 (quoting Groves v. State Farm Mut. Auto. Ins. Co., 540 S.W.2d 39, 44 (Mo. banc

1976)). Numerous statutes identify specific items that the court may tax as costs. Id. For

 27
example, section 488.012 authorizes taxing more than 22 fees, costs, and charges as “court

costs,” including filing fees, the cost of testimony transcription and court reporter services, and

witness fees. Id. Authority for taxing other various expenses as costs is found throughout

Missouri’s statutes. Id.

 The Wilson Court determined that because no Missouri statute specifically identifies

litigation expenses as court costs, litigation expenses cannot be taxed as costs under section

213.111.2. Id. at 895-96. Wilson went on to state, however, that the MHRA makes a plaintiff

whole only if section 213.111.2 is read to authorize an award of reasonable attorneys’ fees that

includes counsel’s reasonable out-of-pocket expenses normally charged to a fee-paying client.

Id. at 897. “If, under the prevailing practice of the local community, there are reasonably

incurred, out-of-pocket litigation expenses that would normally be charged to a fee-paying client,

the circuit court may include those expenses when exercising its discretion, under section

213.111.2, to award a reasonable attorney fee.” Id.

 We reverse the trial court’s award of litigation expenses. We remand the case so that the

trial court will have the opportunity to consider which, if any, of the out-of-pocket expenses of

Harrison’s attorneys can be properly awarded as attorneys’ fees under Wilson.

 Attorneys’ Fees on Appeal

 Finally, we consider Harrison’s motion for $81,320 in attorneys’ fees on appeal that this

Court ordered taken with the case. Section 213.111.2 authorizes the court to award court costs

and reasonable attorneys’ fees to a prevailing party. A prevailing party includes one who prevails

in an action brought under the MHRA, receives an award of attorney fees from the trial court,

and successfully defends that favorable judgment on appeal. Wilkins v. Bd. of Regents of Harris-

Stowe State Univ., 519 S.W.3d 526, 548 (Mo. App. E.D. 2017).

 28
 We have affirmed Harrison’s claim for actual damages from the University for retaliation

under the MHRA. Harrison also recovered her attorneys’ fees and costs before the trial court.

Having succeeded on a significant issue, Harrison is a prevailing party as defined in Section

213.111.2. Wilson, 598 S.W.3d at 898. Accordingly, we grant Harrison’s request for reasonable

attorneys’ fees on appeal. Because the trial court is better equipped to hear evidence and

argument on this issue and to evaluate the reasonableness of the requested fees, we remand to the

trial court to determine and enter an appropriate award.

 Conclusion

 We conclude that the McGinnis Doctrine does not apply to proscribe verdicts finding the

University liable while exonerating its employee, Lalande. We also conclude there is sufficient

evidence that Harrison engaged in MHRA-protected activity, and that a causal relationship

existed between her engagement in the protected activity and her termination from the

University. Therefore, we affirm the trial court’s judgment entered in conformity with the jury

verdict awarding Harrison $32,000 in actual damages from the University for retaliation under

the MHRA. We also affirm the trial court’s award of attorneys’ fees in the amount of

$464,012.50.

 In light of our Supreme Court’s decision in Wilson v. City of Kansas City, we reverse the

award of litigation expenses, and remand to the trial court to consider which, if any, of the out-

of-pocket expenses of Harrison’s attorneys can be properly awarded as attorneys’ fees.

Finally, we grant Harrison’s request for reasonable attorneys’ fees on appeal, and remand to the
trial court to determine and enter an appropriate award.

 29
 _______________________________
 Angela T. Quigless, P.J.
Kurt S. Odenwald, J. and
James M. Dowd, J., concur.

 30